KNOLL, Justice.
|;On February 14, 2003, a Caddo Parish grand jury indicted Brandy Aileen Holmes (“defendant”) for the first-degree murder of Julian L. Brandon, Jr.[1] On February 14, 2006, a unanimous jury found the defendant guilty as charged.[2] On February 16, 2006, the jury unanimously determined that defendant be sentenced to death, finding all three aggravating circumstances urged by the State, specifically that: (1) the defendant was engaged in the perpetration or attempted perpetration of an armed robbery, first-degree robbery and simple robbery; (2) the defendant know *49 ingly created a risk of death or great bodily harm to more than one person; and (8) the victim was 65 years of age or older.
12This is a direct appeal under La. Const, art. V, § 5(D) by the defendant. Defendant appeals- her conviction and sentence raising 45 assignments of error, variously combined into seventeen (17) arguments, with numerous assignments remaining not argued. We will address the most significant of these assignments of error in this opinion, and the remaining assignments of error will be addressed in an unpublished appendix. After a thorough review of the law and the evidence, for the following reasons we affirm the defendant’s first-degree murder conviction and the imposition of the death sentence.
FACTS
During the early evening hours of January 1, 2003, the defendant and her boyfriend, Robert Coleman,[3] forced their way into the rural home of Julian Brandon, a retired minister who was 70 years of age, and his wife Alice, who was 68 years of age. Reverend Brandon was shot at near contact range in the underside of his jaw with a .380 caliber handgun. The bullet separated into two pieces: one fragment entered the victim’s brain; the other exited the top of his head and was later recovered from the dining room ceiling, adjacent to the front entryway. Julian Brandon immediately collapsed.
Defendant and Coleman then took Mrs. Brandon to the rear bedroom of the residence and demanded her valuables, cash, and credit cards as she begged for her life. The defendants subsequently placed a pillow over Mrs. Brandon’s face, shot her |,<¡in the head, and left her for dead. After shooting Mrs. Brandon, defendant and Coleman heard Reverend Brandon struggling with his wounds. After retrieving three Chicago Cutlery knives from the kitchen, they stabbed and slashed him to death. They inflicted slashing cuts to Reverend Brandon’s nose and face and stabbing wounds on the top and rear of his head and chest. One of the knives struck Reverend Brandon’s head with such force, it shattered and pieces of the knife were found strewn about the crime scene. The offenders cut Reverend Brandon’s throat several times — two large cutting wounds went around the entire neck, severing the carotid artery and jugular vein. Six stab wounds, some wounds penetrating as deep as six inches, were also identified in Reverend Brandon’s left upper chest; these wounds went into the chest cavity and involved the heart and lungs resulting in internal bleeding. Another stab wound was found on the right side of the chest; this wound involved the abdomen and liver. In addition, a six-inch knife was found imbedded up to the handle in Reverend Brandon’s back.
On January 5, 2003, four days after the attack by defendant and Coleman, Calvin Barrett Hudson, a family friend of the Brandons, became concerned when the couple did not attend church on Sunday and decided to check on them. When he and his wife went to their friends’ resi *50 dence, they found Reverend Brandon lying in a pool of his blood on the carpet. Hudson immediately went to a neighbor’s house and called the sheriffs office.
When the police responded to the call, they found Reverend Brandon’s body. It was not until the authorities checked the house that they discovered Mrs. Brandon was barely alive. After the police summoned emergency medical personnel, a medical helicopter was called to transport Mrs. Brandon to the hospital. Even though Mrs. | ¿Brandon received a gunshot wound to the head, she survived the attack; at the time of trial, she remained permanently disabled and requires around-the-clock care.
After the television news reported the crime, the Caddo Parish Sheriffs Office received a tip from persons at an apartment complex near the crime scene. The callers indicated the defendant had been bragging about killing an elderly couple down the road near a church and that she was trying to sell their jewelry. Detectives then went to the trailer of Brenda Bruce, defendant’s mother, which was located near the homicide scene. There they located defendant, Coleman, her mother, and defendant’s 15-year-old brother, Sean George. All four agreed to accompany the officers to the sheriffs office for interviews.
Over the next two days and after being Mirandized numerous times, the defendant made six recorded and unrecorded statements, implicating herself and others to varying degrees in the homicide and robbery; in only the first statement did the defendant deny involvement in the murder of Reverend Brandon. In one of the interviews, defendant claimed she was the shooter in both the murder of Reverend Brandon and the attempted murder of his wife. Defendant further revealed that two days after the violent entry into the Brandon home, she and two of her young nephews bicycled to the Brandons’ residence; only the youngest nephew, nine years of age, entered the residence with her. Defendant stated she went back to the house because she dreamed the woman was still alive; even though she heard Mrs. Brandon’s heavy breathing, she just left the residence. The nine-year-old nephew entered the home with his aunt, where he observed Reverend Brandon lying in a pool of blood and heard Mrs. Brandon screaming from another room in the home.[4] A neighbor | Switnessed both nephews fleeing from the residence, leaving the defendant inside the home.
In addition to several statements the defendant made in which she admitted involvement in the violent entry into the Brandon home and murder, police recovered considerable circumstantial evidence demonstrating her participation. Although the gun used in the shootings was not recovered, ballistics evidence demonstrated that the weapon used in the Brandon homicide was the same weapon that had belonged to defendant’s father and had been stolen from his residence in Ty-lertown, Mississippi; this theft occurred immediately before defendant and Coleman traveled from Mississippi to Shreveport on Christmas Eve 2002.[5] In one of *51 her statements to the police, the defendant admitted she had stolen her father’s .380 handgun while visiting him in Mississippi. In addition, a surveillance video from Hibernia Bank depicted the defendant and Coleman attempting to use the Brandons’ credit card at an ATM.
A search of the Bruce trailer where the defendant and Coleman were staying led to the discovery of several incriminating items. A multi-colored bracelet found in a clear plastic food service glove was recovered from the rain gutter of the trailer where the defendant stayed; Mrs. Brandon’s daughter identified the multi-colored bracelet as one she had given her mother some time earlier. A box of food service gloves recovered from the bedroom that defendant shared with Coleman had a diamond pattern consistent with blood transfer stains observed at the crime scene. | fiThree fired .380 cartridge casings were also found in the rain gutter of the trailer. Laboratory analysis revealed that Reverend Brandon’s DNA was found on one of these casings. Additionally, forensic analysis matched the .380 projectile recovered from Reverend Brandon’s brain and the dining room ceiling to a projectile recovered from a tree at the home of defendant’s father in Mississippi; defendant’s father had fired the gun into a tree on his property before the gun was stolen.
At the penalty phase, in addition to victim-impact evidence from the Brandons’ two daughters, the State introduced evidence that defendant had attempted another violent home entry days before the charged offense in a gated community known as “Nob Hill.” As a result of one of the defendant’s admissions during investigation, it became known the defendant participated in the homicide of Terrance Blaze days after the Brandons were shot. Regarding the unadjudicated homicide of Blaze, defendant originally directed the authorities to his body during her interrogation concerning the Brandon homicide. While defendant originally claimed Blaze had been killed by a gang member as a result of a drug debt, forensic evidence later demonstrated he had actually been killed in the car owned by defendant’s mother. The bullet recovered from the back of Blaze’s skull had the same class characteristics as the bullet recovered from the tree in Mississippi; additionally, a cartridge casing found near Blaze’s body matched the cartridge case found in Mississippi where the defendant’s father had earlier fired the weapon. High velocity blood spatter and other bloodstains matched to Blaze were found in the defendant’s mother’s automobile and on Coleman’s right boot and right pant leg. Blood spatter evidence indicated Coleman was in the driver’s seat of the vehicle while Blaze rode as the passenger and that the gunshot to the back of Blaze’s head originated from the back seat of the car. 17Pefendant later admitted shooting Blaze in an unsolicited letter to the assistant district attorney.
During the penalty phase, the defendant offered mitigation evidence from her mother, Brenda, Dr. Mark Vigan, an expert in psychology, Dr. Richard Williams, an expert in general medicine and psychiatry with a psychiatric specialty in the treatment of addiction disorders, and Dr. James Patterson, an expert in medicine, psychiatry, and functional neuroimaging. The thrust of this evidence was to show the defendant suffered from Fetal Alcohol Syndrome (FAS),[6] that FAS caused her to *52 have diminished mental capacity, and that this syndrome adversely affected her decision-making process.
The defendant’s mother testified that she drank whiskey during the first three months of her pregnancy and that after-wards she switched to beer. She told the jury she named the defendant Brandy because that was the drink she liked. She stated the defendant had a propensity for eating rocks and that she was in special education classes when she was in school. She explained to the jury that defendant was institutionalized at Sand Hill Hospital in Mississippi for six months when she (defendant) was allegedly raped at twelve years of age.
Dr. Vigan and his staff conducted a battery of neuropsychological tests which examined five major areas: the neuropsycho-logical deficit scale; the impairment index; the category test; the drawing test; and the localization score of the tactual | sPerformance test. Out of these five tests, the defendant tested positive in three of them. Commenting on these test results, Dr. Vigan stated “these results indicate borderline intelligence, but not chronic static organic brain syndrome.” Trial Tr. Vol. XXX, p. 6090 (Feb. 16, 2005). He further stated these tests showed defendant suffered from “organic brain impairment, or loss of mental and emotional— loss of cognitive abilities secondary to some kind of brain dysfunction or damage or abnormalities.” Id. at 6091. Although Dr. Vigan’s staff suggested the defendant may have FAS based upon their observation of her facial features, he stated he could not make that diagnosis because he is not a medical doctor and that diagnosis is a medical one.
Under cross-examination, Dr. Vigan agreed that the defendant basically functions mentally at least on a seventh grade level.[7] He also concluded the defendant is responsible for her actions, that she lacked empathy for other people, and she did not learn well from her prior punishment.[8] He further noted that although the | ¡idefendant had been evaluated numerous times by various members of the psychiatric community, none of them ever diagnosed her as having FAS.
*53 Dr. Williams opined that the defendant has a diminished capacity for her responsibility because she has brain damage. “She [the defendant] had brain damage not by her own choice. It was a conduit from the toxicity of alcohol. So I think she has a diminished capacity in accepting responsibility for her behavior.” Trial Tr., vol. XXX, p. 6162 (Feb. 16, 2006). Dr. Williams further stated he found the defendant “has a borderline level of intellectual functioning. I think under axis three that she has brain damage and brain dysfunction as a result of fetal alcohol syndrome.” Id. at 6138. He agreed that persons who suffer from FAS “often experience mental health problems, disruptive school experience, inappropriate sexual behavior, trouble with the law, alcohol and drug problems, and difficult[y] in caring for themselves.” Id. at 6162. In quantifying the degree of FAS, Dr. Williams opined that the defendant fit into the FAS categories, but her case was not the most severe. Dr. Williams further stated that brain scans, such as the ones requested from Dr. Patterson, were necessary to confirm a diagnosis of FAS. In conclusion, Dr. Williams stated “this possibly [may] be the very first case in American jurisprudence where somebody was convicted of first degree [murder] and the evidence of fetal alcohol syndrome was presented to a jury in the death phase.” Id. at p. 6194.
Dr. Patterson, the medical expert in psychiatry and neuroimaging, was the last medical expert to testify on the defendant’s behalf during the penalty phase. The defendant presented his testimony “[t]o evaluate the brain scans from the defendant for abnormalities.” Id. at p. 6199. His evaluation included an MRI and a PET scan of the defendant’s brain. He found the MRI showed significant structural abnormalities of the defendant’s brain that were “consistent with published reports | inon brain findings in fetal alcohol syndrome.” Id. at p. 6200. He also stated that the MRI did not show other brain abnormalities associated with the published literature in FAS, ie., defects in the corpus callosum; changes in the ventral frontal cortex; changes of the hippocam-pus; decreased brain metabolism. He found the PET scan showed abnormalities, “but the results were not consistent with published results [on fetal alcohol syndrome].” Id.
As noted above, after reviewing the evidence, including the mitigating evidence, the jury was unpersuaded by the experts’ mitigation evidence and an unanimous jury determined a sentence of death should be imposed.
MENTAL COMPETENCY TO PROCEED TO TRIAL
(Assignments of error 1, 2, and 3)
Defendant contends the trial court erred when it ruled she had the mental capacity to stand trial. In the present case, the record shows the defendant filed a motion for the appointment of a sanity commission on March 17, 2005, nearly a year before trial. In the request for a sanity commission, defense counsel alleged difficulties in communicating with the defendant and noted her placement in the mental health unit of the jail; earlier learning and developmental disorders; and the possibility she suffered from FAS. The trial court granted the motion and appointed psychiatrists, Dr. Charles Armistead and Dr. George Seiden, to the sanity commission.
Dr. Armistead met defendant and submitted a report describing their interaction in detail, including her responses to a number of questions posed to ascertain her competency. At the conclusion of the report, Dr. Armistead opined:
*54 This patient is considered to be of borderline intelligence, but appears to understand the charges against her, the general function of her lawyer and the judge and the trial procedures. She also understands the consequences of being found guilty and not guilty. She apparently has a history of a psychotic disorder, perhaps bi-polar with depressive | nepisodes of elation. She is considered able to stand trial and able to-cooperate with her lawyer in her own defense. From her ability of recollect and recount the events with which she is charged, it is my impression that she was competent at the time of the alleged offenses and understood the meaning and significance of her acts, although perhaps influenced by the use of cocaine at the time.
Trial Tr., vol. XI, p. 2352 (March 30, 2005).
Dr. Seiden also interviewed defendant personally and reviewed 30 documents (many of them police reports relating to the crime) which he used to assist in his evaluation. In his report, Dr. Seiden thoroughly described his interview with the defendant, including several of her responses to his inquiries verbatim, and offered the following opinion:
Based on my evaluation, I have concluded that Brandy Alaine [sic] Holmes currently has the ability to consult with her attorney with a reasonable degree of rational understanding and currently has a rational and factual understanding of the proceedings against her. Specifically, she understands the nature of the charges against her and can appreciate their seriousness. She understands what defenses are available to her. She can distinguish a guilty plea from a not guilty plea and understands the consequences of each. She has an awareness of her legal rights. She understands the range of possible verdicts and the consequences of conviction. She has the ability to recall and relate facts pertaining to her actions and whereabouts at certain times. She has the ability to assist counsel in locating and examining relevant witnesses. She has the ability to maintain a consistent defense. She has the ability to listen to the testimony of witnesses and inform her lawyer of any distortions or misstatements. She has the ability to make simple decisions in response to well-explained alternatives. If necessary to her defense strategy, she is capable of testifying in her own defense. Her mental condition is not likely to deteriorate under the stress of trial.
I have also concluded, with reasonable medical certainty, that at the time of the alleged offense, Ms. Holmes was not suffering from any mental disease or defect that rendered her incapable of distinguishing right from wrong with reference to the conduct in question.
Trial Tr., vol. XI, pp. 2363-64 (April 27, 2005).
The State and defense submitted the matter based on the reports and the trial court found the defendant possessed the mental capacity to proceed. Despite the experts’ conclusions concerning her competency, the defendant claims the doctors’ 1 ^observations of her raised serious questions concerning her mental capacity to proceed.
It has long been established that a person whose mental condition is such that he lacks the capacity to understand the nature of the proceedings against him, and is unable to assist counsel, may not be subject to trial. Drope v. Missouri, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975). Thus, in order to proceed with trial, a defendant must be “legally competent.” Medina v. California, 505 U.S. 437, 449, 112 S.Ct. 2572, 2579, 120 L.Ed.2d 353, *55 365-66 (1992). Louisiana’s statutory scheme for detecting mental incapacity “jealously guards a defendant’s right to a fair trial.” State v. Nomey, 92-1631 (La.1/19/93), 613 So.2d 157, 161, (quoting State v. Rogers, 419 So.2d 840, 843 (La.1982)). Notwithstanding, Louisiana law presumes defendant’s sanity. La.Rev. Stat. § 15:432; State v. Edwards, 257 La. 707, 243 So.2d 806 (1971). Thus, the burden is upon the accused to establish by a preponderance of the evidence that the mental incapacity delineated in La.Code Crim. Proc. art. 641 exists. State v. Frank, 96-1136 (La.10/4/96), 679 So.2d 1365, 1366; State v. Morris, 340 So.2d 195 (La.1976).
La.Code Crim. Proc. art. 641 provides that “[mjental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense.” Although a trial court may receive expert medical testimony on the issue of a defendant’s competency to proceed to trial, the ultimate decision of capacity rests alone with the trial court. La.Code Crim. Proc. art. 647; Rogers, 419 So.2d at 843. A reviewing court owes the trial court’s determination of a defendant’s mental capacity great weight, and its ruling should not be disturbed in the absence of manifest error. State v. Perry, 502 So.2d 543, 549 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987); State v. Machon, 410 So.2d 1065, 1067 (La.1982); Morris, 340 So.2d at 203.
In State v. Bennett, 345 So.2d 1129, 1138 (La.1977), this Court held that the appropriate considerations for determining whether the accused is fully aware of the nature of the proceedings include:
whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction.
Additionally, in determining an accused’s ability to assist in his defense consideration should include:
whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
Bennett, 345 So.2d at 1138 (citations omitted).
The defendant first points to a portion of Dr. Armistead’s notes where he quoted defendant misstating the charges pending against her. Despite defendant’s contention in this regard, we note that while she may have not correctly identified all the charges she faced, she accurately told the doctor she had been accused of two murders. In addition, she correctly identified the pending charges when Dr. Seiden interviewed her.
Next, the defendant questions Dr. Ar-mistead’s conclusion she could assist in her own defense because he noted in his report that she wanted to hurt herself *56 during |14the trial of her co-defendant, Coleman. Dr. Seiden also referenced an alleged suicide attempt by defendant that occurred during Coleman’s trial. Notwithstanding the defendant’s statements concerning suicidal ideation, our review of the record shows both doctors concluded such ideation would not interfere with her ability to assist in her own defense. In light of defendant’s contention, we note it is hardly surprising that a defendant facing a capital murder charge may be depressed or contemplate suicide; as noted in the medical testimony, the defendant was receiving a prescribed anti-depressant during her incarceration pending trial. Moreover, the record shows that in an addendum to his report, Dr. Seiden stated he reviewed supplemental reports provided to him by various institutions and hospitals where defendant resided before committing the present offense and that these records “suggest that she exaggerated ... details of her past history” including multiple references to past suicide attempts. Trial Tr., vol. XI, p. 2365 (April 27, 2005).
Additionally, the defendant attempts to demonstrate she was not competent to stand trial because several police reports reveal that she gave inconsistent and sometimes implausible statements concerning the crimes. In particular, the defendant points to the fact she gave multiple versions of the incidents in an effort to minimize her or her boyfriend’s culpability. She contends this evidence contradicted Dr. Seiden’s belief she could assist counsel. Accepting the defendant’s contention in this regard for purposes of argument, we observe such facts alone do not suggest she was unable to assist counsel at trial.
Next, as evidence of her inability to comprehend the charges or assist in her defense, appellate counsel calls our attention to a letter the defendant wrote to the district attorney in which she suggests her dissatisfaction with a plea offer trial counsel tendered to her. The letter reads:
|ir,Good Evening Sir! I apologize to Mr McClatchey, But this isn’t true. But Sir let me put my point across please. If I refused to take your offer of 2 life sentences, what in the world would you Believe, I would ask my Lawer (which do not see eye to eye) to come back with a much more offering, then you guy’s asked me to accept. Mr. McClatchey told me I’ll Be Better off with life. Yes I did shot & kill Terrance Blaze, but only because I was threatting and Beat-ting up to do so. I’m asking would you, please disregard this plead offering. Because I did not ask him to take this act. Thank you and have a nice day.
Trial Tr., vol. V, p. 1098 (Feb. 6, 2004).[9]
Defense counsel maintains the incriminating content of the letter demonstrates the defendant possessed no understanding of the legal consequences relating to her role in the crimes and thereby rendered her incompetent. After reviewing the defendant’s contention, we find no support for it. Although the letter suggests the defendant may not have understood the legal subtleties relative to the law regarding principals, in no way does it demonstrate she could not assist counsel in her defense.
Finally, in addition to arguing the trial court should have found the defendant incompetent irrespective of the sanity commission’s conclusion to the contrary, the defendant asserts that additional evidence presented following the submission of the sanity commission’s reports should have prompted the trial court to reconsider its earlier ruling. With that as her impetus, *57 a week prior to trial, defense counsel re-urged the motion to quash the indictment, contending new evidence was available for the trial court’s consideration. Specified- , ,, , „ , , ,, . , , ly, the defendant argues the trial court should have considered the evidence her experts provided in support of the motion to quash the indictment, alleging that FAS rendered her functionally mentally retard-ed and hence ineligible for the death pen-s^e father contended that newly °ítained rummaging had revealed multi-pie areas ot her brain were abnormal and _^⅛⅛6(3.[10] She contends that in light of ⅛⅛ evidence, the trial court should have revisited the issue of whether she main-tained the capacity to stand trial.[11] De *58 fendant |17further relies upon documents relating to the MRI and PET scans produced at the hearing relating to her low intelligence and diminished brain.
Even assuming the defendant met the statutory definition of mental retardation delineated in La.Code Crim. Proc. art. 905.5.1, an issue ultimately unresolved below because defense counsel did not present this issue to the jury, it would not necessarily follow that she was incompetent to stand trial. Equating competency, which addresses a defendant’s ability to understand the proceedings and to assist in her own defense, see La. Code Crim. Proc. art. 641, with mental retardation, which acts as a mitigating circumstance exempting a defendant from the death penalty, constitutes an hyperbole and does not accord with this state’s well-accepted jurisprudence. Cf. State v. Brogdon, 426 So.2d 158, 168 (La.1983) (“while subnormal intelligence is a relevant factor in assessing a defendant’s present capacity to stand trial, it is not of |isitself dispositive of the issue....”). Notably, defendants with IQ’s in the 60’s have been shown competent to stand trial. State v. Brooks, 541 So.2d 801 (La.1989); State v. Charles, 450 So.2d 1287 (La.1984). See also, State v. Bennett, 345 So.2d 1129, 1139 (La.1977) (on reh’g) (“Unlike mental illness, which is a variable state, difficult to measure retrospectively, mental retardation is a more static condition and hence its effect upon defendant’s capacity to stand trial can be as easily determined now as it could have been contemporaneously with the trial”).
Finally, as the State ably points out, the record contains several letters the defendant authored while she was incarcerated awaiting trial. Although these letters do not demonstrate a sophisticated knowledge of the legal system, their content supports the proposition that the defendant understood the nature of the proceedings and the serious charges pending against her.[12]
Iiflln summation, members of the sanity commission unanimously opined the defendant was competent. Moreover, even Dr. Vigan, whose testimony defendant primarily relies upon in support of this claim and who admitted he did not examine her to determine competency, testified she understood her rights and was able to communicate with her attorneys. Ultimately, Dr. Vigan conceded he had not “specifically examined [defendant] for competence to stand trial,” and had not “administered *59 any competency to stand trial tests.” Rather, he “assume[d] that the other doctors, Dr. Armistead, Dr. Seiden, and Dr. Williams all have commented that she’s competent to proceed to trial.” Trial Tr., vol. XIX, p. 4197 (Nov. 10, 2005). Finally, at the penalty phase, Dr. Vigan effectively conceded defendant’s competency, stating:
[T]wo sanity physicians evaluated her for competency to stand trial, and they found her competent. So those doctors would have examined her ability to understand the rights that she has. She certainly ... know[s] that she has a right to a trial and a trial by jurors. She certainly knows she has a right to consult with her attorneys, and she has been doing that and working with them. And the sanity doctors have already found that she’s competent to proceed to trial. So I think she’s — I would assume that she can understand to the minimal at least what legal rights are about.
Trial Tr., vol. XXX, p. 6128 (Feb. 16, 2006).
Considering the totality of this evidence and the trial court’s personal observations of the defendant, we find nothing suggests the trial court committed manifest error when it found the defendant mentally competent to stand trial. This argument lacks merit.
MENTAL RETARDATION
(Assignment of error 11)
Next, relying upon Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) and Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), defendant claims she suffers from compromised intelligence and |2na diminished mental age as a result of FAS. See supra, p. 52, n. 6 (explaining FAS). Accordingly, she contends her death sentence constitutes excessive punishment and must be vacated.
In support of her claim, defendant filed a “Motion to Quash Indictment” in the trial court, alleging she possessed “neurological and psychological deficiencies” that disqualified her from the death penalty based on the Supreme Court’s rationale in Atkins (exempting mentally retarded persons from capital punishment) and Roper (holding that the Eighth Amendment precludes capital punishment for offenders under the age of 18 when they committed their crimes).[13]
The State opposed the defendant’s motion to quash, arguing that “a factual defense to any charge (such as minority or mental retardation at the time of the offense) is not a proper ground for a motion to quash” and that the matter should be decided by a jury. Trial Tr., vol. XII, p. 2580 (Sept. 23, 2005). Nevertheless, the State did not oppose a pre-trial hearing on the motion so that it could obtain discovery concerning the evidence defendant relied upon on the issue. Id. Notwithstanding, the State firmly maintained that its argument would remain “the same; neither Roper nor Atkins apply to this case, and the court should not extend them ‘by analogy,’ and cannot make any sort of pre-trial determination of a factual defense via motion to quash.” Id.
The trial court conducted an extensive hearing on defendant’s motion to quash. Specifically, the trial court received testimony from psychiatrist Dr. Richard Williams and psychologist Dr. Mark Vi-gan.[14] However, at the conclusion of the *60 hearing, the |2itrial court found no legal basis existed for it to grant the motion to quash the capital prosecution. It stated:
.... I have had a chance to carefully review that motion [to quash] as well as the attached report from Dr. Vigan, which is in conjunction, of course, with his testimony. I would note for the record, of course, Code of Criminal Procedure, Article 532 through 533; and I will also note for the record the unrebut-ted testimony of the IQ of Miss Holmes, which is 77 which is borderline. I understand all of what I have heard today through the testimony of Dr. Vigan and Dr. Williams.
However, I conclude that as a matter of law that there is no legal basis for me to grant the motion to quash. Accordingly, motion to quash the indictment is denied in all respects.
If we get to the penalty phase, if we get to the penalty phase, of course, the jury can hear all of the evidence presented today as well as any other evidence, some of which the DA may want to present. Motion denied.
Trial Tr., vol. XIX, pp. 4215-16 (Nov. 10, 2005).[15]
A week before trial, defendant filed a “Motion to Re-Urge Motion to Quash Indictment” in which she claimed neuroimag-ing of her brain revealed abnormalities and impairments that further established she suffered from fetal alcohol syndrome which rendered her ineligible for execution under Atkins and Roper. In response, the State reiterated that the trial court lacked the authority to grant the motion, arguing:
laafLa.Code Crim. Proc. art.] 905.5.1 is very clear that defense counsel has to make the claim first that the defendant is mentally retarded, which they haven’t done; and second, before the court ... [can] make any sort of pretrial ruling, both the State and the defense have to agree that so be done, and that wasn’t done here either. So I don’t understand why we’re even talking about mental retardation here. Absent some sort of proper notice by the defense that they’re going to claim mental retardation defense and absent some agreement by both parties, this court doesn’t have any power to do anything concerning mental retardation.
Trial Tr., vol. XIX, P. 4214 (Nov. 10, 2005).
The trial court agreed and denied the defendant’s re-urged motion, stating, “I believe there is no basis whatsoever to quash the indictment even based on the new material submitted to the Court.” Trial Tr., vol. XIX, p. 4268 (Jan. 31, 2006).
Defendant now argues the trial court should have ruled on the merits of her mental retardation claim based upon FAS *61 and found her ineligible for the death penalty. We disagree.
La.Code Crim. Proc. art. 905.5.1, added to the Code of Criminal Procedure by 2003 La. Acts 698 in response to Atkins, provides the procedure for use in the event a defendant raises a claim of mental retardation. In particular, La.Code Crim. Proc. art. 905.5.1 provides, in pertinent part:
C.(l) Any defendant in a capital case making a claim of mental retardation shall prove the allegation by a preponderance of the evidence. The jury shall try the issue of mental retardation of a capital defendant during the capital sentencing heanng unless the state and the defendant agree that the issue is to be tried by the judge. If the state and the defendant agree, the issue of mental retardation of a capital defendant may be tried prior to trial by the judge alone. (Emphasis added).
In State v. Turner, 05-2425 (La.7/10/06), 936 So.2d 89, 96-97, cert. denied, 549 U.S. 1290, 127 S.Ct. 1841, 167 L.Ed.2d 337 (2007), we upheld the constitutionality of La.Code Crim. Proc. art. 905.5.1. Specifically, we upheld the jury provision of art. 905.5.1 as follows:
1 ¿olf the State may consign to a jury the complex factual and legal question of whether a defendant suffers from a mental disease or defect rendering him incapable of distinguishing between right and wrong and thereby exempting him from criminal responsibility altogether, La.Rev.Stat. 14:14, then, a forti-ori, the State may assign to a jury the task of determining whether defendant is mentally retarded and exempt, not from criminal culpability, but from the death penalty....
sis * *
Notwithstanding the concerns expressed by some commentators and courts, absolutely no jurisprudence suggests that requiring the jury rather than the court to decide whether the defendant has established mental retardation violates due process or a defendant’s Eighth Amendment rights. Neither Atkins nor other controlling legal principles compel the selection of a specific fact finder regarding mental retardation or require the determination be made at a specific point in the adjudication process. As to any requirement that a trial judge should in all cases make an initial pretrial finding on the question of mental retardation, that policy choice, whether wise or unwise, is for the Legislature.
Turner, 936 So.2d at 99. (Emphasis added) (citations omitted).
In the present case, the record clearly shows the State did not acquiesce to submitting the issue of mental retardation to the trial judge. The record likewise establishes the defendant never submitted the issue of mental retardation for jury determination. Accordingly, not only did the trial court lack the legal authority to quash the indictment based on the defendant’s allegations, the issue was never presented for determination during the capital sentencing hearing. Therefore, defendant’s assignment of error lacks merit.
DUE PROCESS
(Assignments of error 4 and 5)
The defendant first contends the State violated her due process rights when it offered an alternate theory of the crime at the trial of her co-defendant, Robert Coleman, and argued a different theory of the crime to the jury in her trial. In a related matter, the defendant further argues the *62 trial court erred when it granted the State’s motion in limine preventing her from presenting any evidence at either the | ¾guilt or penalty phase of the trial, revealing that Coleman had been convicted of first-degree murder and sentenced to death.
Due process forbids a state from employing inconsistent and irreconcilable theories to secure convictions against individuals for the same offenses arising from the same event. Smith v. Groose, 205 F.3d 1045, 1048-49 (8th Cir.2000), cert. denied, 531 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000)(convictions of accomplices in a murder/robbery were obtained at separate trials through diametrically opposed testimony from a third participant; such manipulation of evidence rendered trial fundamentally unfair and required reversal); compare Nichols v. Scott, 69 F.3d 1255, 1268-72 (5th Cir.1995)(guilty plea of one co-defendant does not preclude murder prosecution of the other when it could not be determined whose gun caused the fatal wound).
In support of her argument to this Court, the defendant draws our attention to the United State Supreme Court’s recent decision in Bradshaw v. Stumpf, 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005). There, Stumpf and his partner, Wesley, both armed with guns, robbed Mr. and Mrs. Stout in their Ohio home; they then shot the couple, and left them for dead. Police learned the identities of the perpetrators, and Stumpf surrendered to the police. After learning that Mr. Stout survived the shooting, Stumpf confessed to shooting him twice in the head, but denied inflicting the injuries that killed Mrs. Stout. Stumpf pleaded guilty, and proceeded to the penalty phase, held before a three-judge panel, in which he made a threefold argument in mitigation: (1) that he had participated in the plot at the urging of Wesley; (2) that it was Wesley who had fired the fatal shots into Mrs. Stout; and (3) that his minor role in the murder militated against a death sentence. The panel rejected Stumpfs arguments and sentenced him to death.
| asSubsequently, Wesley was successfully extradited to Ohio where the same prosecutor tried the case before the same trial judge. By the time of Wesley’s separate trial, new evidence had arisen since Stumpfs plea, namely, Wesley’s cellmate, Eastman, testified Wesley admitted to him that he fired the shots that killed Mrs. Stout. The prosecutor argued that Wesley was the principal offender in Mrs. Stout’s murder; thus, he should be sentenced to death. Wesley countered that the prosecutor had taken a contrary position in Stumpfs penalty phase trial, and that Stumpf had been sentenced to death for the crime. Wesley testified that Stumpf had shot Mrs. Stout. Ultimately, the jury sentenced Wesley to life imprisonment ■with the possibility of parole after 20 years. Stumpf, 545 U.S. at 180, 125 S.Ct. at 2404.
Thereafter, Stumpf, whose direct appeal was pending, attempted to withdraw his guilty plea or vacate his death sentence. Stumpfs action was based on the prosecution’s argument at Wesley’s trial that Wesley had been responsible for Mrs. Stout’s death. Eventually, Stumpfs case was considered in the United States Supreme Court where he urged the invalidity of his guilty plea based on his claim he was unaware of the specific intent element to the aggravated murder charge, and that his due process rights had been violated by the state’s deliberate action in securing convictions of both Wesley and him for the same crime, using inconsistent theories. Stumpf, 545 U.S. at 182, 125 S.Ct. at 2405.
The Supreme Court upheld Stumpfs guilty plea as valid, and found he exhibited *63 the requisite specific intent to support a plea of guilty to aggravated murder, specifically when he put a gun to Mr. Stout’s head and fired twice. The Court held that the aggravated murder charge did not require any showing that Stumpf had personally shot Mrs. Stout; rather, the Court observed Ohio law considers aiders and abettors equally in violation of the aggravated murder statute, as long as the aiding 12r.and abetting is done with the specific intent to cause death. Id., 545 U.S. at 184, 125 S.Ct. at 2406. Finding that Stumpf and Wesley shared the same deadly intent, the Court found it immaterial which of the two men actually shot Mrs. Stout and upheld the guilty plea, noting that:
Stumpf and Wesley had gone to the Stouts’ home together, carrying guns and intending to commit armed robbery. Stumpf, by his own admission, shot Mr. Stout in the head at close range. Taken together, these facts could show that Wesley and Stumpf had together agreed to kill both of the Stouts in order to leave no witnesses to the crime. And that, in turn, could make both men guilty of aggravated murder regardless of who actually killed Mrs. Stout.
Stumpf, 545 U.S. at 184, 125 S.Ct. at 2406 (emphasis in original).
The Supreme Court’s reasoning with respect to principals to capital murder comports with this Court’s holding in State v. Anthony, 98-0406 (La.4/11/00), 776 So.2d 376, 385-87 (holding that the State is not required to show defendant actually pulled the trigger in order to sentence him to death in a first-degree murder prosecution; instead to carry its burden of proof successfully, the State must prove defendant acted in concert with his co-perpetrators, that defendant had the specific intent to kill, and that one of the aggravating elements enumerated in the first-degree murder statute was present).[16]
^Addressing Stumpfs due process rights, the Court opined the prosecutor’s use of allegedly inconsistent theories “may have a more direct effect on Stumpfs sentence” because arguably “the sentencing panel’s conclusion about Stumpfs principal role in the offense was material to its sentencing determination.” Id., 545 U.S. at 187, 125 S.Ct. at 2407-08. Nevertheless, the Court deemed the issue premature and remanded the case to the Sixth Circuit Court of Appeals to consider the question of how Eastman’s testimony and the prosecutor’s conduct in the Stumpf and Wesley cases relate to Stumpfs death sentence in particular. Id., 545 U.S. at 187, 125 S.Ct. at 2408.
In the present case, the defendant contends that in Coleman’s trial, the State argued he was the individual who shot Julian Brandon and inflicted the majority of the crime scene carnage. Referring to blood spatter on Coleman’s boots, the State argued, “That puts those boots on *64 the killer shoving that gun up under [Rev. Brandon’s] chin and pulling the trigger.” Brief for the Appellant, p. 14, n. 17. The State also presented evidence that Coleman admitted shooting Julian Bx-andon to two of his cellmates. During its closing argument at the penalty phase in the Coleman trial, the State described Coleman “butchei’ing” Julian Brandon and described his conduct as follows:
.... After a gun shot wound, probably after several killing stab wounds to the chest all of which didn’t satisfy. And then he’s got to saw into his neck. He’s sawing in the neck of ... our must vulnerable citizens. That’s why you need to kill him. His attack was done without mercy.
Brief for the Appellant, p. 15.
In ai*gument to us, the defendant contends the State “abruptly changed course” at her trial. While maintaining it was only required to prove her participation as a principal, she argues the State relied heavily on the statement in which she admitted to shooting Julian Brandon. At the defendant’s trial, the State also presented | ^testimony from Caddo Parish Sheriffs Office (CPSO) Captain Bobby Abraham concerning his interview with defendant in which “she describe[d] herself basically as the main actor once inside” the Brandons’ residence. Trial Tr., vol. XXVI, p. 5430 (Feb. 12, 2006). In addition, CPSO Detective Kay Ward testified about the defendant’s statement in which she (defendant) claimed she shot both Mr. and Mrs. Brandon and that “Robert [Coleman] was there but he didn’t participate in the killing.” Trial Tr., vol. XXVI, p. 5508 (Feb. 12, 2006). After the defendant ai'gued at the penalty phase that her diminished mental capacity rendei-ed her less culpable than Coleman, the State responded in its rebuttal with a recapitulation of violent episodes earlier during the defendant’s life and stated that Coleman:
wasn’t the catalyst that brought this murder before you. Robert Coleman wasn’t there when she battered the corrections officer. Robert Coleman wasn’t there when she took a piece of glass and slit the corrections officer. He wasn’t there when she was killing a kitten.
The signs of her violence have been manifesting for years. She was like a time bomb that finally went off.
Trial Tr., vol. XXX, p. 6236 (Feb. 16, 2006).
As bonne out in the record and her brief to this Court, defendant’s focus on selective portions of the evidence presented and the State’s closing arguments at both trials is misleading. As an initial matter, defendant concedes in her brief that at “Coleman’s trial, the prosecution argued that Coleman and Holmes both played an active role in the murder of Mr. Brandon [and] ... charged Coleman as a principal in the alternative.” Brief for the Appellant, p. 14. In is abundantly clear that the State was free to speculate which of the defendant’s statements was the most truthful concerning her actual participation in the shooting of Julian Brandon. More importantly, during closing argument at the guilt phase, the State argued that even if the defendant was merely “policing up the crime scene making sure nobody gets | apcaught,” she was concerned in the commission of the offense and thus guilty as a principal. Trial Tr., vol. XXVIII, p. 5777 (Feb. 14, 2006). During rebuttal closing at the guilt phase, the State further argued:
We can’t say which slice she inflicted, which stab she inflicted, which one of the times the trigger was pulled her finger was on it. But we can tell you that she was there helping, participating. It was too much for one person and that she wanted them dead because she didn’t wear a mask and all the other things *65 we’ve told you. When you realize that she had the specific intent to kill, she was involved in the killing and as the defense has conceded the victims were over 65, it was during an armed robbery, a burglary, and there was more than one person, the only appropriate verdict is guilty as charged of first degree murder.
Trial Tr., vol. XXVIII, pp. 5812-13 (Feb. 14, 2006).
Similarly at the penalty phase, rather than arguing that defendant was the shooter, as she claimed in one of her statements, counsel for the State argued:
... I don’t think we’re ever going to have an answer to whose hand the gun was in as it relates to the Brandons and whose particular hand the knife was in as it relates to the Brandons, you have seen what the evidence does show. And that’s simply coming back to this concept that they participated part and parcel together from start to finish.
Trial Tr., vol. XXX, p. 6286 (Feb. 16, 2006).
It is axiomatic that at the defendant’s trial, the State focused upon her culpability while at Coleman’s trial, the evidence centered on his conduct. Cf. State v. Lavalais, 95-0320 (La.11/25/96), 685 So.2d 1048, 1056-57, cert. denied, 522 U.S. 825, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997) (“Although the state’s positions in defendant’s trial and Smith’s trial may appear inconsistent at first glance, this appearance results from the fact that the state’s emphasis as to culpability was different in the two trials .... [a]nd that any inconsistencies in the state’s position in the two trials does not rise to the level of fundamental unfairness.”)(footnote omitted).
In State v. Scott, 04-1312 (La.1/19/06), 921 So.2d 904, cert. denied, 549 U.S. 858, 127 S.Ct. 137, 166 L.Ed.2d 100 (2006), we considered and rejected a similar |3nargument in response to the defense claim that the State had adopted an inconsistent theory to obtain a first-degree murder conviction and death sentence against Scott’s co-defendant, James Dunn. There we remarked, finding that the argument:
in Dunn’s trial did not commit the prosecution and therefore jurors to a single theory of Dunn’s guilt for the double murder which diametrically opposed and wholly negated any theory of defendant’s legal or moral culpability arising out of his complicity in the murders as a principal “concerned” in the commission of the offense. La. R.S. 14:24. The remarks otherwise constitute mere argument of counsel, their understanding of what the facts showed, and thus, not evidence and not admissions of fact within the personal knowledge of a party opponent and that party’s representatives for purposes of La.C.E. art. 801(D)(3)(a). This claim fails on the merits.
Scott, 921 So.2d at 958.
In the present case, as in Scott and Lavalais, the State neither set forth inconsistent nor mutually exclusive theories of the crime at defendant’s and Coleman’s trials. To the contrary, it is clear the State merely emphasized each offender’s culpability at their respective trials. Accordingly, we find no merit to defendant’s argument.
In a related issue, the defendant contends the trial court erred when it granted the State’s motion in limine to exclude any evidence that another jury had convicted Coleman of first-degree murder and sentenced him to death for his role in the crime. In its written motion in limine, the State asked the trial court to exclude the evidence at both phases of the defendant’s trial, claiming “[i]t is a long established principle of Louisiana law that evidence that another person has been or is being prosecuted for the same offense is *66 incompetent and inadmissible.” (Citation omitted). Trial Tr., vol. XVII, p. 3673 (Jan. 27, 2006). Over defense objection, the trial court granted the State’s motion as it related to the guilt phase and deferred ruling on whether Coleman’s conviction and sentence could be introduced at the penalty phase.
131 At the conclusion of evidence at the penalty phase, the defense proffered into the record “the minutes from the Robert Coleman case showing that he was convicted and that he would receive the death penalty.” Trial Tr., vol. XXX, p. 6208 (Feb. 16, 2006). The trial court admitted the minutes, but stated that “[t]he jury does not get to see that however.” Id. Defense counsel responded, “Yes, sir, I understand. That was because of the motion in limine that the State filed.” Id.
In its motion for a new trial, defense counsel reurged the issue, and in its ruling denying the motion, the trial court stated,
.... The fact of the matter, I believe the trial record will clearly bear this out, is that neither side wanted any evidence of any results of Coleman’s trial.
So, it is really disingenuous to now argue that defense wanted to present to the jury evidence of Coleman’s guilt verdict and death penalty verdict. That was not something the defense wanted. They fought against that. Actually it was an agreement by both sides that it would be going outside the record of admissible evidence to present any results on Robert Coleman. So, the record needs to be made clear so that a reviewing judge years from now will not be misled....
Trial Tr., vol. XXX, pp. 6265-66 (Feb. 21, 2006).
As an initial matter, we observe, contrary to the trial court’s statement otherwise, nothing in the record shows the defense agreed with the State’s motion in limine to exclude the evidence. Correla-tively, we further note the State does not point to any support for the trial court’s comment in its brief to this Court. Rather, the State contends the trial court’s ruling was correct because it prevented the defense “from attempting to lessen the jury’s sense of responsibility for convicting and sentencing Brandy Holmes by implying or arguing that since Coleman had received the ultimate sentence Brandy Holmes should get a pass on her sentence.” Brief for the Respondent, p. 19. _|j,After reviewing the record in light of the assertions of counsel, we find the State’s argument that the evidence was irrelevant at both phases of trial is fully established. As discussed supra, the State did not offer inconsistent theories of the offense at defendant’s and Coleman’s separate trials. We further note the record fully shows the defense was permitted to cross-examine witnesses and extensively argue Coleman’s role in the crime and both parties’ relative culpability. Moreover, La.Code Crim. Proc. art. 905.2 provides that “[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on the family members.” (Emphasis added). Accordingly, evidence relating to Coleman’s criminal punishment for his role in the offense was irrelevant and could have very well diverted the jury from the task before it, namely, the character and propensities of the defendant.
After reviewing the jurisprudence, we find the trial court’s ruling in the present case accords with State v. Brogdon, 457 So.2d 616 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985). In Brogdon, the defendant attempted to call his co-defendant as a witness in his capital sentencing phase; the *67 co-defendant had been previously tried for the same first-degree murder, convicted, and sentenced to life imprisonment, after the jury was unable to reach a unanimous decision at his penalty phase. Brogdon argued he was entitled to have the jury consider that his codefendant received a life sentence as a mitigating circumstance or as a meaningful basis for deciding whether his case fell within the category of capital or non-capital punishment. Brogdon, 457 So.2d at 625-26. The trial court disagreed, finding the co-defendant’s sentence was irrelevant. We upheld that decision of the trial court, holding the Legislature did not intend “to require a detailed comparative analysis of other first degree murder cases and sentences by the jury in a capital sentence | shearing.” Id., 457 So.2d at 626. Moreover, we observed in Brogdon the function of comparative analysis falls to this Court as part of its Rule 28[17] review of capital sentences. Id. Accordingly, in the present case, the trial court was eminently correct when it prohibited defense counsel from arguing that jurors should spare defendant’s life solely because another jury had sentenced Coleman to death and thereby assigned to him the highest degree of moral culpability for the offense. Brogdon, 457 So.2d at 616. Therefore, these assignments of error lack merit.
MOTION TO SUPPRESS
(Assignments of error 13-15)
In these assignments of error, the defendant argues the trial court erred when it denied her motion to suppress her multiple inculpatory statements about the crimes. Specifically, she alleges the statements were given in violation of the Fifth and Sixth Amendments of the United States Constitution because she did not voluntarily waive her rights. She further contends she did not want to discuss the .offenses. In addition, she maintains the police illegally coerced the statements when they employed “manipulative tactics ... on a functionally retarded woman with significant brain damage.... ” Brief for the Appellant, p. 34. Finally, the defendant asserts her ^statements about the offense were involuntary because her interrogators repeatedly claimed they had evidence implicating her brother in the crime. She contends the repeated assertions of her interrogators were untruthful and thus rendered her subsequent statement about the offense involuntary.
It is hornbook law that before 'the State may introduce a confession into evidence, it must demonstrate the statement was free and voluntary and not the product of fear, duress, intimidation, men- ' ace, threats, inducements or promises. La.Rev.Stat. § 15:451; La.Code Crim. Proc. art. 703(D); State v. Simmons, 443 So.2d 512, 515 (La.1983). If a statement is a product of custodial interrogation, the State must make a threefold showing: first, that the person was advised before questioning of his right to remain silent; second, that the person was told that any *68 statement he makes may be used against him; and, third that the person was counseled that he has aright to an attorney, either retained or appointed. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). When claims of police misconduct are raised, the State must specifically rebut the allegations. State v. Vessell, 450 So.2d 938, 942-943 (La.1984). A trial court's finding as to the free and voluntary nature of a statement carries great weight and will not be disturbed unless the evidence fails to support the trial court’s determination. State v. Benoit, 440 So.2d 129, 131 (La.1983). Credibility determinations lie within the sound discretion of the trial court and its rulings will not be disturbed unless clearly contrary to the evidence. Vessell, 450 So.2d at 943. When deciding whether a statement is knowing and voluntary, a court considers the totality of circumstances under which it is made, and any inducement is merely one factor in the analysis. State v. Lavalais, 685 So.2d at 1053; State v. Lewis, 539 So.2d 1199, 1205 (La.1989).
lasAt the hearing on the defendant’s motion to suppress, Detective Kay Ward, testified concerning her investigation of defendant. Det. Ward stated the defendant became a suspect after she implicated herself in the murder during conversations with neighbors and attempted to sell some jewelry purportedly stolen from the Bran-dons’ residence. On the evening of January 5, 2003, Ward, accompanied by Officers Sheila Hostnick, Bobby Abraham and Bill Duncan, went to the mobile home where the defendant was staying with her mother. There they encountered the defendant, her mother Brenda Bruce, her 15-year-old brother, Sean George, and Robert Coleman. All four agreed to accompany the officers to the sheriffs office. After participating in the interviews of Bruce, George and Coleman, Ward interviewed the defendant.
From the outset, Ward advised the defendant of the customary Miranda warnings. The defendant indicated she understood the Miranda warnings, signed a waiver of rights form and agreed to give a statement at 12:23 a.m. When the defendant implicated her friend, Johnny Wright, in the murder, Ward decided to record the statement. Ward described defendant as “very cooperative” and stated that at no time she requested to stop the interview or request the presence of counsel.
Based on the initial information defendant had given her, Ward, accompanied by Officer Hostnick and Detective Charles Bradford, left in an effort to locate Johnny Wright while defendant remained at the sheriffs office. After Wright was located and interviewed and his involvement in the present crime was explored, Ward returned and took another statement from defendant at approximately 3:00 a.m. Before making this statement, defendant was Mirandized again and waived her rights. In this statement, the defendant said she had been at the Brandons’ residence when the victim had been killed. Ward also learned that while she (Ward) was gone [.^looking for Wright, defendant had told Captain Abraham and Lieutenant Duncan that the Brandons’ burned credit cards could be found near the dead body of Terrance Blaze. Ward stated that while she attempted to locate Wright:
Brandy had told Captain Abraham while he was talking to Brandy and Lieutenant Duncan that — and they were talking about Mr. Brandon’s credit cards. And Captain Abraham had asked Brandy what happened to the credit cards, and she said she burned them. And he said, where? And she said, on a dirt road. He said, can you show me? And she said, if I *69 show you that, I have to show you something else. And he said, what? And she said, another death body.
Trial Tr., Vol. XIX, p. 4068 (July 21, 2005).[18]
At approximately 4:00 a.m., defendant led Ward and Sergeant Gary Frake to Blaze’s body. It was located approximately one quarter of a mile from the mobile home of defendant’s mother. Upon returning to the sheriffs office, Ward took another statement from defendant, this one concerning Blaze’s murder. Again, before giving the statement, Ward administered Miranda warnings, and the defendant waived her rights.
At the conclusion of this interview, Ward left her office to confer with Captain Abraham. When Ward returned to the office, she observed that the cassette tape of the most recent interviews, which she thought she had labeled, now appeared blank. Ward then learned that after she left her office, defendant left the interview room to use the restroom. Accompanied by Officer Hostniek, Ward entered the women’s restroom where she found the cassette in the garbage can; the label had been peeled off and the recording tape had been removed. Ward later learned that two of the |S7waiver of rights forms defendant had executed had also been destroyed. When Ward asked the defendant if she would give another statement, defendant responded that she was tired. Defendant later admitted to Captain Abraham that after Ward had left the room, she had opened the drawer where the blank cassette tapes were kept and substituted a blank tape for the one she had destroyed and left in the bathroom. At that time, Ward also observed defendant was no longer wearing a bracelet and ring (presumably stolen from the Brandons’ residence) which she had worn earlier during the first interview.
At 8:26 a.m., the defendant gave another statement to Ward. Again, defendant gave no indication she did not want to talk or exercise any of her Miranda rights. In this statement, the defendant claimed she went to the Brandons’ residence with Johnny Wright after she told him she needed money to return to Mississippi. After Reverend Brandon opened the door, Wright burst into the home and shot him. Defendant then demanded account numbers from Mrs. Brandon and later tried to shoot her, but the gun jammed; ultimately, Wright shot her as well. Defendant saw Mr. Brandon getting up and retrieved a knife and “cut” him. She also maintained that Coleman was at her mother’s house during the violent entry into the Brandon home and murder and had no idea that she and Wright were committing the offense. Defendant was subsequently booked into the Caddo Correctional Center (“CCC”).
The following day, Ward, accompanied by Detective Jeff Ivey contacted the defendant. She executed yet another waiver of rights form before making a final statement. An underlying theme of this statement was that the detectives claimed to know that defendant’s brother, Sean George, was present at the Brandon crime scene, a fact she adamantly and repeatedly denied. However, the allegations clearly upset defendant, so much so that she exposed Coleman’s participation again. The laadetectives also focused considerable at *70 tention on the gun and tried to ascertain its location; the detectives’ attempts were fruitless. The statement concluded with defendant’s gratuitous (and apparently false) announcement that she was pregnant. Ward made it clear that throughout her multiple contacts with defendant, at no time did anyone threaten or coerce the defendant. She further stated the defendant never asked for an attorney and was provided with the opportunity to eat, drink and use the restroom.
Corporal Sheila Hostnick also testified at the suppression hearing and corroborated Ward’s testimony concerning the defendant's initial interview and similarly identified the waiver of rights form the defendant executed. Like Ward, Hostnick testified the defendant was very cooperative and she was neither threatened nor coerced into making any statement. Hostnick also described leaving the sheriffs office to locate Johnny Wright and returning some time later only to learn that defendant had given a different statement about the crime to Captain Abraham. In that statement, the defendant provided information about the Blaze homicide. Hostnick did not accompany the defendant and Ward to the Blaze crime scene. However, much later that morning, she transported the defendant to the Caddo Correctional Center, where the defendant was charged with murder.
Also testifying at the motion to suppress hearing was Sergeant Gary Frake.[19] Frake accompanied Detective Ward and the defendant to the Terrance Blaze crime scene. Later, after Ward had left her office to confer with Captain Abraham, defendant asked Frake if she could use the bathroom. After Ward later informed him that she suspected that the cassette tape used to record the most recent interview was | sgmissing, Frake told her that he had heard the toilet flush several times while the defendant was in the restroom. At no time during the investigation did Frake observe anybody threaten, coerce or make promises to the defendant.
Captain Bobby Abraham supervised the investigation and testified that based on information defendant had given other officers during the initial interrogation, Ward, Hostnick and Bradford left the sheriffs office to locate suspect Johnny Wright. While the other officers were looking for Wright, Abraham entered Ward’s office and approached defendant, telling her that he did not “quite believe the story that she had told Detective Ward and Hostnick earlier.” Trial Tr., vol. XIX, p. 4115 (July 21, 2005). Defendant then told Abraham that she participated in the violent entry into the Brandon home with both Wright and her boyfriend, Coleman. Defendant continued that after she brandished a pistol to shoot Reverend Brandon, she shot him when he wrestled with her for control of the gun. Defendant claimed she and Coleman then confronted Mrs. Brandon; after taking two of her credit cards, the defendant placed a pillow over Mrs. Brandon’s head and shot her as well. When defendant heard Reverend Brandon was still breathing, she went to the Brandons’ kitchen where she armed herself with a knife and cut his throat. Defendant then said she exited through the rear door of the Brandons’ residence and unsuccessfully attempted to use their credit cards at a neighborhood Hibernia Bank. Defendant told him she later burned the credit cards and left them off of Roy Road. Defendant then told Abraham that he would be “shocked” when she took him to the area *71 where she had burned the credit cards because “there was another body at that location also.” Id., pp. 4117-18. Because Abraham was responsible for supervising the investigation, rather than conducting interrogations, he did not record this interview, but exited Ward’s office and requested that Lieutenant Bill Duncan return to the office with him. In Duncan’s |4npresence, the defendant then gave substantially the same statement about the murder albeit going “into a little more detail as to what happened.” Id. Abraham explained:
.... She went into more detail about where Mr. Brandon was when she cut him and when she shot him on the floor area of the house.
The only other difference was she told us that when she shot Mrs. Brandon, that the first time she pulled the trigger, the gun jammed. And she showed a motion and showed us how she racked the gun back and shot Mrs. Brandon that time. And the second time is when she put the pillow over her face. Other than that, it was the same.
Id., p. 4118.
This statement, too, was not recorded.[20] Abraham stated that before he confronted defendant, Ward had informed him that she had administered Miranda warnings. Moreover, Abraham stated the defendant personally confirmed to him that she had been advised of her rights.
Abraham also testified about confronting the defendant regarding the cassette tape she had destroyed in the bathroom after temporarily being left alone in Ward’s office. Defendant initially blamed Ward for the tape’s destruction because the detective “knew I was a criminal when she left the tape in the office here with me.” Id., p. 4120. The defendant then explained to Abraham that after observing Ward leave the cassette with her incriminating statement on the desk, she (defendant) replaced it with a blank tape from inside the officer’s desk drawer and then took the original tape to the bathroom, where she destroyed it.
Abraham testified he never observed the defendant being threatened or coerced before making her statement to him. Rather, he opined she may have been motivated to confess out of concern for her mother and brother. Before making her statement to him, the defendant told Captain Abraham that neither family member was involved 141in anything to do with the homicide; consequently, the defendant urged Abraham to allow them to go home. Abraham responded that if that was true, he would permit them to leave, but that defendant would have to “tell ... what happened.” Id., p. 4121.
After hearing the detailed testimony about the defendant’s various statements, the trial court denied the defendant’s motion to suppress. Addressing the defendant’s allegations, the trial court stated:
The fact of the matter is that, and the evidence clearly shows, that Ms. Holmes was advised of her rights, her constitutional rights in accordance with the Miranda decision at the very outset. And then she was also readvised numerous times throughout the interviews with her. I believe that she had a sufficient understanding of her rights and I believe that she intelligently waived her Fifth Amendment right to remain silent. ...
... [I]t is alleged by defense that inculpatory statements made by her while in custody were obtained through *72 interrogation after she invoked her Fifth Amendment right to remain silent and her Sixth Amendment right to have the assistance of counsel. There is absolutely no evidence whatsoever to suggest that at any point she invoked her Fifth Amendment right to remain silent, and at no time did she invoke her right to have assistance of counsel. Edwards versus Arizona clearly doesn’t apply. ...
Specifically in listening to the testimony and evidence in this case, I conclude that Detective Kay Ward with the Cad-do sheriffs office, Corporal Sheila Host-nick, Sergeant Gary Frake, Captain Bobby Abraham, and Lieutenant Duncan are all credible witnesses; and I accept their testimony as truthful.
Id., pp. 4137-88.
The trial court further concluded that defendant’s act of destroying the cassette tape in which she made her most inculpa-tory recorded statement and the waiver of rights forms belied any inferences that the investigating officers used undue force or coercion. In fact, the trial court found that “officers did not exert enough supervision and control over Ms. Holmes during the interrogation process,” which led to her “deceptive acts, taking the tapes and the rights forms going to the bathroom, going |42into that room unattended and destroying the evidence.” Id., p. 4139. The trial court also countenanced any misrepresentations made by detectives concerning the physical evidence they possessed, stating that “deceptiveness as an interrogation tactic and interrogation strategy is not illegal and it’s not improper.” Id. In light of the testimony and the documents introduced at the hearing, the trial court concluded there was “absolutely no evidence” to support the allegations in the motion to suppress. Id., p. 4140.
After carefully examining the arguments of counsel, we find the record and the law fully support the trial court’s ruling. As an initial matter, we observe both the signed waiver of rights form and testimony from both Ward and Hostnick demonstrated the defendant had been administered Miranda warnings and waived her Miranda rights. No requirement exists for the State to advise a defendant that she was a suspect in a first-degree murder for her to execute a knowing waiver of rights. See, e.g., Patterson v. Illinois, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988) (Miranda warnings alone sufficiently apprise the defendant of his Sixth Amendment right to counsel and of the consequences of abandoning that right; no additional or refined warnings needed in this context); cf. La.Code Crim. Proc. art. 218.1 (when a person has been arrested, the police must advise him “fully of the reason for his arrest or detention. ...”).
Moreover, while not dispositive of the issue of whether the defendant’s confession was illegally coerced, the fact that the investigating officers administered Miranda warnings several times during the interrogation militates in favor of the State’s assertion that the defendant’s confessions were voluntarily given. See e.g., United States v. Huerta, 239 F.3d 865, 871-72 (7th Cir.2001) (confession voluntary in part because defendant received Miranda warnings three times and executed | ^written waiver); Rook v. Rice, 783 F.2d 401, 404-05 (4th Cir.1986) (confession voluntary despite defendant’s low intelligence, 7th grade education, and statement by police that “the only thing that could help him was to tell the truth” because he was given Miranda warnings twice and indicated that he understood them).
Furthermore, despite the defendant’s appellate claim that her low intelli *73 gence rendered her wavier of rights and subsequent statements involuntary, well established jurisprudence from this state shows otherwise. See e.g., State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272, 278-84 (La.1995) (mildly retarded defendant’s waiver of rights was knowing and intelligent, even though psychologist testified defendant was unable to comprehend his rights; psychologist also testified defendant was educable and could be made to understand rights, police officers testified defendant understood his rights in part because of his prior criminal history); State v. Istre, 407 So.2d 1188, 1186-87 (La.1981) (19-year-old who had IQ of 68 and who did not know his own age intelligently waived rights, which were explained in simplistic terms that he apparently understood); see also State v. Brown, 414 So.2d 689, 696 (La.1982) (‘“Moderate mental retardation and low intelligence or illiteracy do not of themselves vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession.’ ”) (citations omitted).
Turning now to the defendant’s contention that she confessed to Abraham only to obtain the release of her mother and brother, the record clearly shows the officer testified that he truthfully told her merely that if, indeed, these family members played no part in the murder, that they could return home. Furthermore, we note that a paramedic who responded to the crime scene reported that Mrs. Brandon had indicated two Caucasian persons were responsible for the attack; Coleman, defendant’s co-defendant, is African American. Thus, the record supports that it was |44at least possible at that point of the investigation that Detective Ward suspected that defendant’s brother had played a role in the offense. Moreover, the record further shows Detective Ward had previously investigated the defendant and her brother in connection with a burglary in the neighborhood.
Considering the above stated factual scenario and notwithstanding the defendant’s motive for her confession, appellate courts have consistently held that “confessions given in response to exhortations to consider the health, well-being and liberty of close relatives are admissible.” State v. Massey, 535 So.2d 1135, 1141 (La. App. 2 Cir.1988) (citing State v. Baylis, 388 So.2d 713, 716 (La.1980); State v. Weinberg, 364 So.2d 964, 970 (La.1978)).
Finally, even assuming that Ward and Ivey knowingly lied when they insisted that they had evidence placing the defendant’s brother inside the Brandons’ residence, such interrogation techniques have been consistently upheld. See Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969) (“fact that the police misrepresented [a co-perpetrator’s] statements” held “insufficient ... to make [an] otherwise voluntary confession inadmissible.”); Hawkins v. Lynaugh, 844 F.2d 1132 (5th Cir.1988) (mere “trickery” alone will not necessarily invalidate a confession); State v. Sanford, 569 So.2d 147, 152 (La.App. 1 Cir.1990), writ denied, 623 So.2d 1299 (La.1993) (same); State v. Horton, 479 So.2d 528, 530 (La.App. 1 Cir. 1985), writ denied, 493 So.2d 1215 (La.1986) (holding a confession free and voluntary despite impetus the police provided when officers informed defendant that an accomplice had implicated defendant in murder); see also Miriam S. Gohara, A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques, 33 Fordham Urb. L.J. 791, 805-06 (2006) (“Few federal courts have circumscribed the use of specific deceptive interrogation techniques, and Lsonly in rare cases have federal courts deemed deceptive interrogation practices coercive.... Interrogations em *74 ploying false or fabricated evidence where interrogators have misled suspects to believe that police possessed inculpatory evidence, including physical evidence or accomplices’ confessions have generally been held to be voluntary.”). After thoroughly reviewing the record and the defendant’s contentions, we find the defendant has not established any basis for suppression of her multiple statements.
GUILT PHASE: STATE’S MOTION IN LIMINE
(Assignment of error 12)
The defendant next argues the trial court erred when it granted the State’s motion in limine to prevent her from introducing any evidence of mental deficit or fetal alcohol syndrome (FAS) at the guilt phase. After hearing oral argument on the issue, the trial court granted the State’s motion. Explaining its ruling, the trial court stated:
It is clear that Ms. Holmes has tendered a plea of not guilty. Period. She has not pled not guilty and not guilty by reason of insanity. Accordingly, she may not introduce evidence of insanity or mental defect at the time of the offense during the guilt phase.
Trial Tr., vol. XIX, p. 4259 (Nov. 10, 2005).
In her motion for a new trial, the defendant revisited the trial court’s earlier ruling, alleging she should have been permitted to introduce evidence of diminished mental capacity, specifically evidence that she suffered the effects of FAS. The defendant premised her argument on the claim that the exclusion of this evidence during the guilt phase denied her the right to present a defense by introducing “evidence which would have allowed her to counter and explain the State’s evidence against her, including but not limited to her confessions and/or statements to various law enforcement officers.” Trial Tr., vol. XVIII, p. 3957 (Feb. 21, 2006). Defendant [ ^further claimed the trial court’s ruling permitted the State “to use her mental defects against her, while preventing defendant from either testifying or presenting any evidence to explain her appearance, mannerisms and lack of understanding of any abstract concepts.” Id. In its ruling denying the new trial motion, the trial court restated that “there is no entitlement by defense, again, to present evidence during the guilt phase of fetal alcohol syndrome.” Trial Tr., vol. XXX, p. 6267 (Feb. 21, 2006).
In argument to this Court, the defendant claims that given her penchant for story telling and exaggeration, evidence that she suffered from FAS could have explained her “susceptibility to manipulation, her inability to distinguish the truth from lies, and inappropriate expressions and behavior due to her limited capacity to understand what is appropriate in any given situation.” Brief for the Appellant, p. 41.
La.Code Crim. Proc. art. 651 provides in part: “When a defendant is tried upon a plea of ‘not guilty,’ evidence of insanity or mental defect at the time of the offense shall not be admissible.” Under La.Rev.Stat. § 14:14, the Louisiana codification of the M’Naughten rule,[21] an offender is exempt from criminal responsibility only if he is incapable of distinguishing between right and wrong with reference to the conduct in question. As a result, evidence of a mental defect which does not meet the M’Naughten definition of insanity cannot negate a specific intent to commit a crime and reduce the degree of the offense. See State v. Deboue, 552 So.2d 355, 366 (La.1989), cert. denied, 498 U.S. *75 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990) (while not claiming insanity at commission of the murders, defendant argued in vain that mental retardation rendered him incapable of forming specific intent for aggravated burglary of the murder victims’ home); State v. Nelson, 459 So.2d 510, 516-17 (La.1984), 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985) (no error 1^disallowing defense questions to psychiatrist designed to show the accused’s mental defect falling short of M’Naughten); State v. Lecompte, 371 So.2d 239, 245 (La.1979) (on reh’g) (“The real danger in permitting psychiatric evidence of mental or emotional disorders short of insanity to negate intent is to practically destroy the M’Naughten rule and to clutter practically every trial with some sort of expert opinion evidence as to whether the defendant possessed the requisite intent....”).
Notwithstanding the operation of article 651 of the Code of Criminal Procedure, we have repeatedly recognized a defendant’s constitutional right to present a defense. See State v. Van Winkle, 94-0947 (La.6/30/95), 658 So.2d 198, 201; State v. Gremillion, 542 So.2d 1074, 1078 (La.1989); State v. Vigee, 518 So.2d 501, 503 (La.1988); State v. Shoemaker, 500 So.2d 385, 389 (La.1987); State v. Vaughn, 431 So.2d 358, 370 (La.1982) (on reh’g). Against that jurisprudential backdrop, there exists some jurisprudential support for the defendant’s claim she should have been allowed to introduce evidence concerning FAS or her diminished mental capacity for the limited purpose of challenging and/or explaining aspects of her various statements.
In State v. Whitton, 99-1953 (La.App. 4 Cir. 9/27/00), 770 So.2d 844, the Fourth Circuit found the trial court erred when it excluded evidence that the defendant suffered from blackouts caused by substance abuse to challenge the voluntariness of his confession. Specifically, the defendant maintained he had been truthful when he initially told police that he did not recall committing the multiple murders and had later been supplied with the facts that he related in his confession by police both before and during his recorded statement. Relying on dicta from this Court’s opinion in State v. Van Winkle, 658 So.2d at 203 (suggesting that the trial court erred when excluding evidence of the defendant’s mental state during her | ^various inculpatory statements) and La.Code Crim. Proc. art. 703(G),[22] the Whitton court held that “some evidence of mental defect may be admissible when it concerns the circumstances surrounding the making of a confession in order to enable the jury to determine the weight to be given the confession.” Id., 770 So.2d at 854. See also Crane v. Kentucky, 476 U.S. 683, 689, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986)(“[R]egardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant’s *76 case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubts on its credibility.”); State v. Williams, 01-1650 (La.11/1/02), 831 So.2d 835, 843 (holding that the statutory rule of La.Code Crim. Proc. art. 703(A) which permits the defendant to introduce evidence at trial as to the circumstances surrounding his confession “has its underpinnings in the Due Process Clause and it necessarily operates independently of any credibility determinations the trial court made in ruling on the voluntariness of the statement as a matter of law.”).
Nonetheless, we hasten to add that the erroneous exclusion of this evidence is subject to the harmless error standard of review. In Crane, supra, a capital case in | ^which the defendant’s sole defense was that there was a lack of physical evidence to link him to the crimes and that, for a variety of reasons, his earlier admission of guilt was not to be believed, the United States Supreme Court found the erroneous exclusion of the defendant’s testimony regarding the circumstances of his confession fell under harmless error review standards. More recently, in State v. Blank, 04-0204 (La.4/11/07), 955 So.2d 90, 133, cert. denied, — U.S. -, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007), we found the trial court erred when it overruled the defendant’s objection to redacting portions of his confession as it included information revealing that he had been administered a polygraph examination, and not allowing the defendant to examine the agent who administered the polygraph at trial to support his claim that his confession was unreliable as a result of coercive interrogation techniques. Nonetheless, we concluded in Blank that because the transcript of the interrogation did not support the claim that the defendant’s confession was coerced and because defendant consistently denied his involvement in the murder to the agent who administer the polygraph examination, the excluded evidence would not have caused the jury to disregard defendant’s subsequent lengthy and detailed confession and the trial court’s error was thus harmless. Id., 955 So.2d at 134-36.
In the present case, although evidence of defendant’s diminished mental capacity and diagnosis of FAS may have helped explain her susceptibility to manipulation and disinterested demeanor at trial, such evidence would have done nothing to diminish the evidence demonstrating that at a minimum, she acted as a principal to the first-degree murder of the victim. Independent of defendant’s statements, the State’s crime scene reconstruction expert Lieutenant Mark Rogers corroborated large portions of the defendant’s statements. Moreover, as discussed supra, considerable circumstantial evidence presented at trial demonstrated her guilt. | fi[yAccordingly, even assuming the trial court should have admitted evidence of the defendant’s mental deficiency to help explain the circumstances of her various statements to police, exclusion of the evidence was harmless. Defendant’s assignment of error lacks merit.
VOIR DIRE
(Assignments of error 16-18)
In these assignments, the defendant claims that reversal of her conviction and death sentence is required because of a trial court ruling on a challenge for cause during voir dire and because the trial court limited the scope of voir dire examination adversely to the defendant. Initially, the defendant maintains the trial court improperly granted a State challenge for cause to prospective juror Veronica Ivy because her responses during voir dire *77 revealed she was not morally opposed to returning a death verdict. Defendant also claims the trial court improperly limited the scope of voir dire when it did not allow counsel to examine jurors in depth about whether they could consider FAS as a mitigating circumstance at sentencing.

Challenge for cause

A trial court is vested with broad discretion in ruling on challenges for cause and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683, 686-87; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1280. “[A] challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror’s responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably [inferred].” State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990).
The proper standard for determining when a prospective juror may be excluded for cause because of his/her views on capital punishment is whether the juror’s views | S1 would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); State v. Sullivan, 596 So.2d 177 (La.1992), rev’d on other grounds sub nom. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The basis of exclusion under La.Code Crim. Proc. art. 798(2)(a), which incorporates the standard of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as clarified by Witt, is that the juror “would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him.... ” Witherspoon further dictates that a capital defendant’s rights under the Sixth and Fourteenth Amendments to an impartial jury prohibits the exclusion of prospective jurors “simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.” Id., 391 U.S. at 522, 88 S.Ct. at 1777.
In the present case, the State only exercised six of its peremptory challenges. Accordingly, the State first argues that even assuming the trial court erred when it excluded the juror for cause based on her perceived inability to vote for the death penalty, the trial court’s error was harmless.
La.Code Crim. Proc. art. 800(B) provides that a defendant cannot complain of an erroneous grant of a challenge to the State “unless the effect of such a ruling is the exercise by the state of more peremptory challenges than it is entitled to by law.” Notwithstanding this provision of article 800(B), the United States Supreme Court has consistently held that it is reversible error, not subject to harmless-error analysis, when a trial court erroneously excludes a potential juror who is Witherspoon-eligible, despite the fact the State could have used a peremptory challenge to strike the | ,-,2potential juror. Gray v. Mississippi, 481 U.S. 648, 664, 107 S.Ct. 2045, 2054, 95 L.Ed.2d 622(1987); Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). Thus, under United States Supreme Court jurisprudence, the State’s failure to exhaust its peremptory challenges does not obviate the need to review the merits of the defendant’s claim.
At the outset, in response to the State’s inquiry about her “feelings” about capital punishment, Veronica Ivy stated, “I’m for the death penalty, but I prefer not to be the one who has to impose it.” Trial *78 Tr., vol. XXI, p. 4435 (Feb. 7, 2006). Later, when the State asked if she could return a vote for death, she then answered, “I don’t know.” Id., p. 4436.
Classifying Ivy “as a theoretical supporter of the death penalty” who “may not be able to impose it herself,” the trial court called her for individualized voir dire. Id., p. 4470. She then repeated to the State that she would “prefer not” to serve on a capital jury, explaining, “I don’t want to be the one to have to make that decision. That’s hard making judgment on someone else’s life, determine a life.” Id., p. 4471. After making several other comments suggesting she did not know whether she could vote for death, the State asked, “If it comes down to it, can you go back and vote with those other people to impose a death penalty on another person that you’ve been looking at for two weeks?” Id., p. 4473. Ivy responded, unequivocally, “No.” Id. In response to defense counsel’s questions, Ivy vacillated again, stating it would not be “impossible” for her to vote for death but that she “would prefer not” to have to make that decision. Id., pp. 4473-74.
After hearing argument on the issue, the trial court granted the State’s cause challenge to Ivy, with the following observations:
Ms. Ivy stated basically different things at different times. I believe that she fits in a category established by the jurisprudence as a | ^theoretical supporter of the death penalty. But I believe, based on the totality of her answers, that she is not one who can impose it. She said, quote, I don’t know if I could-do it. She said, I prefer not to do it. She said, I don’t want to be the one to do it. I don’t want to judge. Who am I to judge? I would have to live with that. She voiced a religious foundation for her viewpoints. She said, I didn’t believe in judging.
And I place great stock in her answer which was concise and to the point of no when asked by Mr. Holland as his last question whether or not she could vote to impose the death penalty. She said emphatically, no. She equivocated before. She equivocated after. But her clear and concise answer to Mr. Holland’s question was no.
I examined her demeanor very carefully. I think she has wrestled with this issue. I think she’s troubled by the possibility of her being called upon to consider and apply the law regarding the punishment issues in a death penalty case, in a first degree murder case. And based on what I have observed by her demeanor, what I infer about her feelings and her tone and everything about her demeanor, coupled with her answer to Mr. Holland that I referred to, I believe that the cause challenge by the State has merit and is accordingly granted.
[[Image here]]
I think she’d be an excellent, splendid juror for other cases, but not for a capital case.
Id., pp. 4476-77.
Our review of the record and the jurisprudence shows the trial court’s ruling was correct. Although Ivy stated she theoretically supported the death penalty, she repeatedly indicated she would prefer not to make that decision. Indeed, as borne out by the transcript of her voir dire examination, it is clear she vacillated considerably when asked whether she could vote for the death penalty. We find it telling that at one point, she unequivocally responded in the negative when asked if she could impose the death penalty upon an actual person that she had been looking at for *79 two weeks. In these circumstances, we find the defendant fails to show the trial court abused its discretion when it granted the State challenge for cause. See State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, 713, cert. denied, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998) (“Although Ms. McAdams and Ms. Lewis were |B4theoretical supporters of the death penalty, a full reading of the voir dire clearly indicates they could not have imposed the penalty in this case.”); cf. State v. Frost, 97-1771 (La.12/1/98), 727 So.2d 417, cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999) (jurors properly dismissed for cause when age of defendant would have impaired their ability to return the death penalty).

Scope of voir dire

Defendant also claims the trial court erred when it denied her the opportunity to examine prospective jurors concerning their ability to consider FAS as a mitigating circumstance.
At the commencement of voir dire, the State made an oral “motion in limine prohibiting the use by defense of the specific term fetal alcohol syndrome or fetal alcohol disorder” arguing that counsel “is entitled to voir dire at length on the law of the case but not entitled to preview their specific defenses.” Trial Tr., vol. XX, p. 4278 (Feb. 6, 2006). The trial court responded that its inclination was to allow the defense to ask jurors if they could consider fetal alcohol syndrome as a mitigating circumstance, but that “to go into it otherwise is inappropriate.” Id., p. 4279. The trial court later clarified its ruling, stating:
[T]he defense can ask the prospective juror if they have ever heard of the term fetal alcohol syndrome. Whether they can consider that along with any other relevant mitigating circumstance.
* *
I think it’s inappropriate for the defense to ask really anything else. I believe that any description of it is unnecessary and inappropriate.
Id., p. 4335.
| BBPefense counsel objected to the trial court’s ruling. He then renewed the request to educate jurors about the condition following the examination of the first panel of jurors, stating:
Your Honor, I just would like to reurge the ability to question the jurors more so on the fetal alcohol syndrome. As we see from this first panel, it seems like everybody has heard of it oddly enough, but that many don’t really realize what it is. Some are even asking or making statements like they heard of it in children but they never have in an adult, as if somehow the brain could somehow get better or fix itself. So I think there is a lack of understanding. If I can’t go into that in more detail, then I may just be stuck with that. I’m getting back from the jury they heard of it, but they really don’t know what it is or how insidious it is.
Id., p. 4390.
The trial court denied the request, stating:
I believe that you’ve had ample opportunity to ask jurors whether or not they can consider fetal alcohol syndrome as a mitigating circumstances and factor. I think you’ve gotten answers. I believe that request shall be denied. I think that has been gone into quite enough. And I think that obviously at the right time, you will have all the time you need to present any and every mitigating circumstance in detail.
Id., pp. 4390-91.
La. Const, art. I, § 17 guarantees a defendant full voir dire examination *80 of prospective jurors and the right to challenge jurors peremptorily. The purpose of voir dire is to determine qualifications of prospective jurors by testing their competency and impartiality in order to discover bases for challenges for cause and for the intelligent exercise of peremptory challenges. State v. Hall, 616 So.2d 664, 668 (La.1993). Nonetheless, the scope of examination rests within the sound discretion of the trial court, and its ruling will not be disturbed absent clear abuse. La.Code Crim. Proc. art. 786; Hall, 616 So.2d at 669. In determining whether the trial court afforded a sufficiently wide latitude to the defendant, the entire voir dire examination must be considered. Id.
| SfiLouisiana law clearly establishes that a party interviewing a prospective juror may not ask a question or pose a hypothetical scenario which would demand a commitment or pre-judgment from the juror or which would pry into the juror’s opinions about issues to be resolved in the case. “It is not proper for counsel to interrogate prospective jurors concerning their reaction to evidence which might be received at trial.” State v. Williams, 230 La. 1059, 89 So.2d 898, 905 (1956). See also State v. Vaughn, 431 So.2d 358, 360 (La.1983); State v. Square, 257 La. 743, 244 So.2d 200, 226 (1971) (“Voir dire examination is designed to test the competence and impartiality of prospective jurors and may not serve to pry into their opinions concerning evidence offered to be offered at trial”), judgment vacated in part, 408 U.S. 938, 92 S.Ct. 2871, 33 L.Ed.2d 760 (1972), mandate conformed to, 263 La. 291, 268 So.2d 229 (1972); State v. Smith, 216 La. 1041, 45 So.2d 617 (1950) (hypothetical questions and questions of law are not permitted in the examination of jurors which call for a pre-judgment of any supposed case on the facts).
In the case sub judice, the trial court’s ruling limiting von- dire did not prejudice defendant. The trial court permitted the defense to question jurors about their ability to consider defendant’s mental deficiencies, allegedly caused by FAS, as a mitigating factor during the penalty phase. As argued by the State, it is inappropriate to allow the defense “to use voir dire to indoctrinate jurors regarding a complex medical subject about which experts will testify later, or to obtain a guarantee that the juror will use that mitigating circumstance to ensure that a death sentence will not be returned.” Brief for the Respondent, p. 50. In summation, we find the defendant fails to show the trial court erred in its rulings during voir dire. Thus, the defendant’s assignments of error lack merit.
PENALTY PHASE: OTHER CRIMES EVIDENCE
(Assignments of error 26-28)
| S7In several related assignments of error, the defendant focuses on unadjudicat-ed other crimes evidence the State presented at the penalty phase of her trial. As discussed more fully below, the State introduced evidence at the sentencing hearing that the defendant unsuccessfully attempted another violent home entry/robbery days before she and Coleman forced their way into the Brandons’ residence and committed the robbery and murder there. The State also presented evidence concerning the defendant’s involvement in the murder of Terrance Blaze days after the murder of Reverend Brandon.[23]
*81 The State claimed in its amended notice of intent to introduce the other crimes evidence that it would show that:
(11) On or about the 27th day of December 2002, the defendant was involved in an attempt to gain entrance information, under false pretenses, to Nob Hill which is a gated community in Blanchard, Caddo Parish, Louisiana.
(12) On or about the 27th day of December 2002 and the 30th day of December 2002, defendant was involved in attempts to gain entry, under false pretenses, into the home of Patricia Camp, with the intention to burglarize the residence and/or murder Ms. Camp.
(13) The defendant was involved in the unadjudicated offenses surrounding the death of Terrance Blaze in Cad-do Parish on or about January 4, 2003.
Trial Tr., vol. XVII, pp. 3599-600 (Jan. 27, 2006).
At the pretrial hearing on the admissibility of the evidence, the State presented the testimony of DA investigator Don Ashley concerning attempts that had been made by a woman calling 911 in an effort to obtain the gate code for Nob Hill.[24] He discontinued that the fraudulent effort to enter the gated community related to two subsequent attempts by defendant, on December 27 and December 30, to gain access to the home of Patricia Camp, a resident of Nob Hill. Camp subsequently identified the defendant from a photographic lineup as the individual who tried to gain entry into her home. Ashley continued that during the investigation of the present offense, the defendant:
admitted going to Nob Hill and attempting to gain entry to that particular house. And had made the comment that had she gained entry, the same thing would have happened to her [Mrs. Camp] that happened to the Brandons.
Trial Tr., vol. XXVIII, p. 5861 (Feb. 14, 2006).
Ashley then testified about the defendant directing police to the body of Terrance Blaze during her interrogation about Reverend Brandon’s murder and her subsequent inculpatory statements, including her written confession in her letter to the district attorney’s office, demonstrating her involvement in that killing.
At the conclusion of the hearing, the trial court ruled evidence of the Blaze homicide admissible. The court stated:
I am ready to rule with respect to the ... Terrance Blaze evidence. That is evidence of unadjudicated conduct and it is clear that at this hearing I believe that this evidence that the district attorney wants to present is clear and convincing. I believe it is competent and reliable. I believe it has relevance and substantial probative value as to Brandy Holmes’s character and propensities.
* * *
I believe that the confession by Ms. Holmes of the unadjudicated crime, that being the second degree murder of Terrance Blaze is admissible because it is competent and reliable and trustworthy *82 in light of the all the other circumstances.
Id., p. 5873.
^Regarding the attempted burglary of Camp’s residence, the trial court held that the State could present evidence of the 9-1-1 recording for the jury. However, the court concluded that the jury could make up its own mind about whether the speaker was the defendant. The trial court then ruled admissible evidence that:
on or about the 27th day of December, 2002, and the 30th day of December, 2002 defendant was involved in attempts to gain entry under false pretences [sic] into the home of Patricia Camp with the intention to burglarize the residence and or murder Ms. Camp.
Id., p. 5874.
At the penalty phase, the State introduced a recording of the 911 call into evidence. In addition, the 9-1-1 operator who took the call testified that the call originated from 3737 Roy Road, where the defendant had been staying. Patricia Camp, 73 years of age, testified the defendant rang her doorbell twice: the first time on December 27, 2002, asking for an individual named Theresa McGee; and the second time, a few days later on December 30, 2002, asking to use the telephone. Camp also testified she identified the defendant’s picture from a photographic lineup. At trial, Camp made an in-court identification of the defendant as the person who had attempted to gain entry to her residence.
The State then presented testimony from Detective Kay Ward who stated the defendant admitted going to Camp’s residence, “but the lady wouldn’t open the door. And she stated in the interview that if the lady would have opened the door that they would have killed them.” Trial Tr., vol. XXIX, p. 5928 (Feb. 15, 2006). The State then played that portion of the defendant’s recorded interview with Ward for the jury.
CPSO Captain Bobby Abraham then testified that during his interrogation about the Brandon murder, the defendant told him she had burned the credit cards stolen from the home. When asked if she could take him to the location of the credit cards, the defendant told him they were on a dirt road near another dead body. The | (¡pdefendant then directed police to that location where they found the body of Terrance Blaze, who had been shot to death.
Forensic evidence showed a gunshot to the back of the head killed Blaze; the evidence further showed Blaze was killed when he was either sitting down or standing up. In her first statement about the Blaze homicide, the defendant claimed he was killed by a gang member named “Marcus” because Blaze owed Marcus money for drugs. The defendant stated that Marcus had threatened her with a gun and forced her to drive his (Marcus’s) vehicle and then pick up Blaze. Blaze entered the passenger side of the vehicle and Marcus confronted Blaze about the alleged debt from the backseat of Marcus’s car. Marcus then shot Blaze in the back of the head.
Subsequently, DNA analysis revealed that Blaze’s blood was found in defendant’s mother’s car. Mark Rogers, a crime scene analyst and an expert in blood stain spatter analysis, testified that circumstantial evidence suggested the defendant shot Blaze in the back of the head from the rear seat of the vehicle as he sat in the passenger seat while Coleman was in the driver’s seat. Finally, Assistant District Attorney Ed Blewer then identified the letter the defendant wrote him in which she admitted that “she did shot and kill *83 Terrance Blaze.... ” Trial Tr., vol. XXIX, p. 6011.
Initially, the defendant argues the State gave insufficient and vague notice of the other crimes evidence.
In State v. Hamilton, 478 So.2d 123 (La.1985), cert.0 denied, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986), we vacated the defendant’s death verdict when it found the State introduced “entirely new evidence of another [unadjudicated] crime ... in the case in chief in the penalty phase, without any notice whatsoever to defendant to be prepared to meet such evidence.” Id. 478 So.2d at 131. The | fi1Hamilton court concluded the notice provision of La.Code Crim. Proc. art. 720[25] should apply also to the penalty phase in a bifurcated capital case. Id., 478 So.2d at 132. Nevertheless, in State v. Ward, 483 So.2d 578 (La.1986), cert. denied, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 168 (1986), we found that a State response to a defense discovery request revealing that the State would rely on “defendant’s prior criminal record,” without more, constituted sufficient notice of the State’s intention to introduce prior crimes evidence at the penalty phase. We then pointed out that:
the notice required in the penalty phase is not as detailed as that required by C.Cr.P. 720 in the guilt phase and State v. Prieur, 277 So.2d 126 (La.1973), because in the penalty phase there has already been a determination of guilt lessening the chance that the defendant will be tried for crimes other than those charged.
483 So.2d at 588. See also State v. Rault, 445 So.2d 1203, 1215 (La.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984) (holding the trial court correctly allowed admission at penalty phase of evidence of defendant’s other criminal activity, even when defense counsel claimed to have received no notice, when testimony of defense witness made it clear that the defense knew of the criminal activity, and defense did not articulate how notice would have changed its strategy).
As discussed supra, in the present case the State provided written notice of its intent to introduce the other crimes evidence and the trial court held a hearing. Thereafter, the trial court determined that evidence of the attempted burglary of Camp’s residence and Blaze’s murder were admissible. At neither the hearing nor during the sentencing phase did the defense claim the State’s notice misled it 'concerning the nature of the evidence it intended to present at the penalty phase. | ^Accordingly, we find no merit to the defendant’s claim concerning insufficient notice of the other crimes evidence.
The defendant further contends the trial court erred when it admitted evidence of the other crimes because the State failed to carry its burden of showing by clear and • convincing evidence that she committed the offenses.
La.Code Crim. Proc. art. 905.2 provides that “[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on family members.” Jurisprudential rules have evolved governing the admission in penalty phase hearings of unrelated and unadjudicated crimes evidence to prove the defendant’s character and propensities. In State v. Brooks, 541 So.2d 801 (La.1989), we approved the *84 State’s introduction in its case-in-chief in the penalty phase of two unrelated and unadjudicated murders after the trial judge made three determinations: (1) the evidence of the defendant’s commission of the unrelated criminal conduct is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the unrelated conduct has relevance and substantial probative value as to the defendant’s character and propensities. Brooks, 541 So.2d at 814. In State v. Jackson, supra, we granted a pre-trial writ of cer-tiorari to establish limitations on the admissibility of unrelated and unadjudicated criminal conduct in capital sentencing hearings. Jackson also incorporated the three-pronged test from Brooks. Jackson, 608 So.2d at 956. There, we ruled the evidence of the unadjudicated criminal conduct must involve violence against the person of the victim for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for capital murder. Jackson, 608 So.2d at 955. Thereafter, we applied the limitations of Jackson in State v. Bourque, 622 So.2d 198 (La.1993). In | Bourque, we held that evidence of an unrelated and unadjudicated killing, committed one hour before the murder at issue in the capital case being tried, was admissible, because it was relevant evidence of Bourque’s character and propensities and fell within the limitation enunciated in Jackson. However, a majority of the Court reversed the death sentence on the basis that the State “presented a prohibited ‘mini-trial’ on the issue of the defendant’s guilt or innocence of the killing of Jasper Fontenot,” the unrelated and unadjudicated conduct. Id., 622 So.2d at 248. Thus, the Bourque decision limited the amount of admissible evidence the State may introduce in the casein-chief of the penalty phase, holding that anything beyond “minimal evidence” of the unadjudicated criminal conduct impermis-sibly shifts the focus of the capital sentencing jury from the character and propensities of the defendant to the determination of the guilt or innocence of the defendant with respect to the unadjudicated criminal conduct.
However, in State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998), we revisited the issue and held that Bourque’s further limitation on the amount of admissible evidence, no matter how highly relevant to the defendant’s character and propensities, was unnecessary to guarantee due process. We noted that the thrust of the Jackson decision was not to exclude any evidence that was significantly relevant to the defendant’s character and propensities, no matter what the amount of the evidence was. Rather, we found the impetus for the Jackson decision was to maintain the jury’s focus on its function of deciding the appropriate penalty by eliminating marginally relevant evidence that does not aid the jury in performing this function. Accordingly, we used Comeaux as a vehicle to provide guidelines to help determine whether character and propensity evidence is admissible at the penalty phase. We held that | ^evidence which establishes that the defendant, in the recent past, “has engaged in criminal conduct involving violence to the person is highly probative of the defendant’s character and propensities. On the other hand, the type of evidence that tends to inject arbitrary factors into a capital sentencing hearing usually is evidence which is of only marginal relevance to the jury’s determination of the character and propensities of the defendant.” Id., 699 So.2d at 16.
We have vacated death sentences in other cases in which we found the trial court admitted unreliable other crimes evidence at the penalty phase. See, e.g., State v. Hobley, 98-2460 (La.12/15/99), 752 So.2d *85 771, 781, cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000) (“Absent extrinsic evidence linking defendant to the alleged crime, we cannot say that defendant’s admission to the unadjudicated crime was [not] the result of braggadocio .... the state must show that the confession was not the product of police coercion and that the crime actually occurred.”); State v. Brooks, 92-3331 (La.1/17/95), 648 So.2d 366, 376 (“[T]he trial court erred in admitting at the penalty phase that part of Brooks’ confession which contained references to multiple unadjudicated offenses not shown by clear and convincing evidence and not supported by competent and reliable evidence — offenses which in fact may not have occurred.”).
In stark contrast to the reversals just cited, our review of the record in the present case shows the trial court carefully considered the reliability of defendant’s confessions to the other crimes, and found at the Jackson hearing that considerable circumstantial evidence corroborated the defendant’s confessions. As detailed above, the record fully supports the determination that the State proved by clear and convincing evidence the defendant’s involvement in the murder of Blaze and the ruse defendant employed in her attempt to gain entry into Camp’s Nob Hill home. | (¡ftAccordingly, the defendant fails to show the trial court erred when it found the State presented the requisite proof she committed these other crimes.
Defendant further contends the State should not have admitted evidence of the Camp incident. The defendant premises her contention on three arguments: (1) she aborted her plan to commit the violent home entry when the intended victim refused to allow her access to the residence; (2) her conduct did not constitute a full-fledged attempt; and (3) this unadjudicat-ed crime should have been found inadmissible under Jackson because it did not involve violence against the person of the victim for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for capital murder.
Our review of the record shows that at the very least, the State proved by clear and convincing evidence that defendant committed an attempted aggravated burglary.[26] This is fully supported through the defendant’s admission concerning her intent when she went to Camp’s house and that she surreptitiously tried to gain entry to the home on two separate occasions. Cf. State v. Lozier, 375 So.2d 1333, 1337 (La.1979)(holding that although unauthorized entry for purposes of La.Rev.Stat. § 14:60 is an entry without consent, express or implied, fraud or threat of force may violate consent when defendant gains entry to the victim’s home under pretense that he was a police officer, the entry was unauthorized as the result of his misrepresentation). Moreover, the defendant’s statement that she would have killed the occupants of the Camp residence was chillingly poignant evidence of her character and propensities, and constituted highly probative evidence for the jury to | ¡^consider. Finally, even assuming the trial court should not have admitted evidence of this incident — it paled in comparison to the properly admitted evidence that defendant shot and killed Terrance Blaze days after the murder of Reverend Bran *86 don — it certainly did not interject an arbitrary factor into the jury’s deliberations at sentencing which would have rendered its verdict unreliable.
PENALTY PHASE: UNADJUDICATED OTHER CRIMES; CROSS-EXAMINATION OF DEFENSE EXPERT
(Assignment of error 29)
In this assignment, the defendant contends the trial court erred when it allowed the introduction of otherwise inadmissible other crimes evidence during the cross-examination of Dr. Vigan, one of her expert witnesses at the penalty phase.
The defendant called Dr. Vigan at the penalty phase and he testified about the. results of neuropsychological testing he conducted and his suspicions that she may suffer from FAS. On cross-examination, the State first confirmed that Dr. Vigan had reviewed the defendant’s medical and legal records. The State then received affirmative responses from Dr. Vigan when it asked if he learned when reviewing these records that: (1) “by age 12 or 13 Brandy Holmes was involved with a black street gang”; (2) “she was involved in drive-by shootings”; (3) “she was expelled from school for taking three knives to school”; (4) “she was involved in multiple burglaries”; (5) “she was in multiple escapes or attempted” escapes; and (6) “she and her boyfriend were involved in kidnaping a girl in Mississippi.” Trial Tr., vol. XXX, pp. 6104-06 (Feb. 16, 2006). At that point, defense counsel lodged an objection, which the trial court overruled. The trial court then stated it would later assign reasons for the ruling.
The State then referred to a summary that Dr. Vigan prepared for the pre-trial hearing on the motion to quash and referred to diagnoses and notes of other mental [ ^health professionals over the years. First, the State pointed to information revealing that at thirteen years of age, defendant had been “combative and assaulted two personnel” at a mental health facility. Id, p. 6107. Medical records further showed the defendant had been diagnosed at fifteen years of age with oppositional defiant disorder and conduct disorder. At seventeen years of age, a clinical psychologist noted “defendant was immature, narcissistic and self-indulgent.” Id, p. 6109. At eighteen years of age, another doctor diagnosed defendant with “post traumatic disorder on axis one,” and “borderline personality disorder with antisocial features on axis two.” Id The State then drew Dr. Vigan’s attention to a report by Dr. George Seiden, who examined the defendant as a member of the sanity commission. After reviewing the report, Dr. Vigan stated that Dr. Seiden assigned the defendant with an axis two diagnoses of antisocial personality disorder and borderline intellectual functioning.
Following Dr. Vigan’s testimony, the trial court explained its rationale for overruling the defense objection as follows:
Let me say for the record that the district attorney can legitimately cross-examine[ ] a defense witness expert, specifically Dr. Mark Vigan, on the basis of his opinion which is that Ms. Holmes is antisocial. According to Dr. Vigan, she fits the criteria that he enumerated, and Dr. Vigan was asked about examples as to why she fit the criteria.
It’s my viewpoint that once the defense puts on a defense expert witness, that witness is subject to broad cross-examination on what that expert has reviewed and what that expert has considered, and that’s pursuant to Article 703 and 705(B) of the Code of Evidence. Particularly in this proceeding, this phase of the case, the issue under law to a great extent is character and propensi *87 ties of the defendant, and that’s under Article 905.2 of the Code of Criminal Procedure.
So I believe that on cross-examination, the prosecution is entitled to elicit the bases for the expert’s various opinions about the defendant. I think to the extent it bears directly on character and propensities, it is most relevant and admissible in this hearing.
Trial Tr., vol. XXX, pp. 6150-51 (Feb. 16, 2006).
| («From the outset, we observe defense counsel failed to lodge an objection to the evidence until after Dr. Vigan answered the State’s inquiries about the other crimes and thus waived any claim based on the testimony subject to Rule 28 review. La.Code Crim. Proc. art. 841; Wes-singer, infra. Moreover, La.Code Evid. art. 705(B) provides that in a criminal case, while every expert witness must state the basis for his conclusion, if the evidence is otherwise inadmissible hearsay, it can be elicited during cross-examination.[27] Accordingly, the State was certainly entitled to ask Dr. Vigan questions about the medical records upon which he relied when he formulated his psychological evaluation of the defendant.
In any event, although the defendant makes several complaints about admission of testimony concerning the other crimes — specifically that it was irrelevant and unreliable, and that the State failed to give proper notice — even accepting these somewhat unconvincing allegations, it would not require us to vacate the defendant’s death sentence. The references to the other crimes were extremely brief and mentioned only in relation to those documents Dr. Vigan had examined when diagnosing defendant. In contrast, the properly admitted evidence at the penalty phase demonstrated that in addition to the brutal murder for which she was convicted, the defendant had participated in Blaze’s killing only days afterwards. In these circumstances, even assuming that admission of the crimes evidence during Dr. Vigan’s cross-examination was improper despite defendant’s failure to object, it did not interject an arbitrary factor into the jury’s deliberations which would thereby render its verdict at the penalty phase unreliable. Accordingly, we find the defendant’s assignment of error meritless.
^EVIDENTIARY RULING: PLEA NEGOTIATION LETTER
(Assignment of error 29)
In this assigned error, defendant claims the trial court erred when it allowed the State to introduce a portion of the letter she wrote to Ed Blewer, an assistant district attorney, in which she admitted killing Terrance Blaze. The introduction of this letter occurred in the penalty phase.[28]
As an initial matter, although defendant claims on appeal that the trial court should not have admitted the letter because it was written in the course of plea negotiations, see La.Code Evid. art. 410,[29] *88 the record shows the defendant did not object to introduction of the document on that basis. Rather, the defense counsel argued he should be allowed to withdraw from the case so that he could appear as a witness to explain the context in which the letter was written. Accordingly, subject to Rule 28 review, given this Court’s settled rule that a new basis for an objection may not be urged for the first time on appeal, State v. Sims, 426 So.2d 148, 155 (La.1983); State v. Stoltz, 358 So.2d 1249, 1250 (La.1978); State v. Ferguson, 358 So.2d 1214, 1220 (La.1978), we find the defendant waived any claim based on admission of this evidence.
TRIAL COUNSEL’S MOTION TO WITHDRAW
(Assignment of error 30)
In this assignment, the defendant claims the trial court erred when it denied her counsel’s motion to withdraw brought approximately one month prior to trial. The basis for defense counsel’s motion was that he might have to testify to explain the context in which the letter that defendant sent the assistant district attorney was written. In the written motion and at the hearing, defendant’s trial attorney, David McClatchey, explained the basis of his motion, stating that if the State introduced the letter in which defendant admitted to killing Blaze, he was “the only witness who could explain what actually transpired between counsel and client that resulted in the letters being sent and the misunderstanding that followed.” Trial Tr., vol. XV, p. 3250 (Jan. 3, 2006); vol. XIX, pp. 4226-28 (July 21, 2005).
In response to the defendant’s motion, the State agreed it would not introduce counsel’s letter in which he made a plea offer to the State which prompted the defendant to contact the assistant district attorney herself. The State further agreed it would redact any reference to plea negotiations in defendant’s correspondence.
The trial court denied the motion to withdraw, stating that if defense counsel wanted to explain the context of the defendant’s unsolicited correspondence to the State, “another lawyer with the Indigent Defender Office could probably provide that information.... ” Id., p. 4232. The trial court also noted that it could provide an admonition to the jury regarding what consideration it should give to the evidence. Noting that trial had been scheduled to begin one month from the counsel’s motion 171to withdraw, the trial court found it “totally inappropriate and unmerited ... to relieve Mr. McClatchey” from the case. Id.
Defendant unsuccessfully re-urged this claim in her motion for a new trial. In its denial of the defendant’s motion the trial court stated:
Everything that Mr. McClatchey uses to form the basis for his objection was marked out. It was blocked through such that the jury would only read exactly what I just stated. Therefore, there was never the need for Mr. McClatchey to be available to testify about the other parts of that letter, which I think, if my memory serves me correctly, pertain to a plea offer by Ms. Holmes to plead guilty to first degree *89 murder of the killing of Reverend Brandon.
Trial Tr., vol. XXX, pp. 6264-65 (April 27, 2006).
Defendant now contends the trial court’s rulings denied her the opportunity to explain the context in which the letter was written without compromising her Fifth Amendment right not to testify. She maintains that McClatchey was “the only witness who could explain, place in context and challenge, the most damning piece of evidence that the state used to prove its most damning assertion at the penalty phase; that Brandy Holmes shot and killed Terrance Blaze.” Brief for the Appellant, p. 65.
Our review of the record shows that any reference to defense counsel’s plea offer was redacted from the letter. Accordingly, the redaction of any reference to a plea offer made the defense counsel’s testimony inessential because there would have been nothing to testify about concerning the context of the letter. We further note the record shows that defense counsel never objected to redaction of the reference to his offer of a plea bargain in the defendant’s unsolicited correspondence to the assistant district attorney. As discussed above, the defendant did present the testimony of multiple experts at the sentencing phase to discuss her low intelligence and suspected FAS and these experts could have offered insight into defendant’s comprehension of |72the charges at the time she authored the letter; such expert insight, however, was not forthcoming.
After carefully examining the record and the jurisprudence, we find the defendant neither shows the trial court abused its discretion when it denied her counsel’s motion to withdraw, nor that she suffered resulting prejudice. See State v. Johnson, 406 So.2d 569, 572 (La.1981) (holding that the attorney’s advising criminal defendant that the best course of action would be to plead guilty by way of plea bargain with State, advice that was properly given in light of abundance of evidence against defendant, was not the sort of actual conflict which would prevent the attorney from rendering effective legal assistance to defendant). The defendant’s assignment of error is meritless.
IMPACT EVIDENCE
(Assignments of error 20-24)
In these assigned errors, the defendant argues the trial court erred when it permitted the State to present improper victim-impact evidence. She contends this evidence interjected arbitrary factors in the jury’s deliberations during sentencing, rendering its verdict of death unreliable.
La.Code Crim. Proc. art. 905.2 provides in part:
The sentencing hearing shall focus on ... the character and propensities of the offender, and the impact that the death of the victim has had on family members, friends, and associates.
(Emphasis added).
As shown in the jurisprudence, two broad categories of victim-impact evidence may be admitted: (1) information revealing the individuality of the victim; and, (2) information revealing the impact of the crime on the victim’s survivors. Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, 369-70, cert. denied, 519 U.S. 860, 117 S.Ct. 462, 136 L.Ed.2d 106 (1996); State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, Scales v. Louisiana, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996); State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, cert. denied, *90 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995). Thus, some evidence depicting the impact of the loss on the victim’s survivors is permitted. Notwithstanding, in State v. Bernard, 608 So.2d 966 (La.1992), we cautioned:
In order to provide general guidance to trial courts in capital sentencing hearings, we reiterate that some evidence of the murder victim’s character and of the impact of the murder on the victim’s survivors is admissible as relevant to the circumstances of the offense or to the character and propensities of the offender. To the extent that such evidence reasonably shows that the murderer knew or should have known that the victim, like himself, was a unique person and that the victim had or probably had survivors, and the murderer nevertheless proceeded to commit the crime, the evidence bears on the murderer’s character traits and moral culpability, and is relevant to his character and propensities as well as to the circumstances of the crime. However, introduction of detailed descriptions of the good qualities of the victim or particularized narrations of the emotional, psychological and economic sufferings of the victim’s survivors, which go beyond the purpose of showing the victim’s individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury’s sentencing decision. Whether or not particular evidence renders a hearing so fundamentally unfair as to amount to a due process violation must be determined on a case-by-case basis.
Bernard, 608 So.2d at 972; see also State v. Taylor, 669 So.2d at 370-371.
Turning now to the record of the present case, we note that at the pre-trial hearing on admissibility, the defendant objected to the presentation of a four and one-half minute videotape of Alice Brandon, the survivor of the defendant’s attack. Defense counsel suggested the videotape did not address the impact of Mr. Brandon’s death upon Mrs. Brandon, but instead depicted the physical injuries she sustained as a result of the defendant’s crime. The defense also objected to the admission of Reverend Brandon’s diplomas which showed he graduated from Centenary College |74and Southwestern Baptist Theological Seminary. At the conclusion of the hearing, the trial court admitted all of the victim-impact evidence the State sought to introduce, particularly testimony from Reverend Brandon’s two daughters about their parents.
At the penalty phase, only two victim-impact witnesses testified. Julie Lloyd, the victim’s youngest daughter, testified about her parents’ livelihoods, her relationship with her parents, and their relationship with one another. She also identified several photos of the family, and finally, discussed Reverend Brandon’s diplomas. Dawn Finley, the victim’s oldest daughter, described in detail her mother’s injuries caused by the gunshot wound she sustained during the violent entry into her parents’ home, stating she needed around-the-clock care. She then narrated the “day-in-the-life” video which depicted her mother’s routine, including the insertion of feeding and tracheotomy tubes, procedures with which she was intimately familiar because of her medical background.
From the outset, we note that at the Bernard hearing the State clearly stated it had already edited the videotape of Mrs. Brandon before the penalty phase at Coleman’s trial. The trial court similarly acknowledged that the video had been re *91 dacted to comply with the strictures of Bernard, at the earlier trial.[30]
17r,Although defense counsel correctly asserts that defendant was not on trial for the attempted murder of Alice Brandon, the defendant was charged with first-degree murder “[w]hen the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.” La.itev.Stat. § 14:30(A)(3). In addition, one of the aggravating circumstances upon which the State relied to seek the death penalty against the defendant was that the “offender knowingly created a risk of death or great bodily harm to more than one person.” La.Code Crim. Proc. art. 905.4(A)(4). In these respects, the videotape depicting Mrs. Brandon’s present physical and mental condition, which precluded her presence at trial, was poignantly relevant and properly admitted.
As to the victim’s diplomas, the defense may be technically correct in its argument that they “go more towards the victim’s worth than the victim’s impact,” Trial Tr., vol. XVIII, p. 5850 (Feb. 14, 2006). Nonetheless, as the State responded, the jury had already been presented with considerable evidence revealing that the victim was a minister and that he bore the title of reverend. Accordingly, we find the diplomas could not have had any untoward inflammatory impact on the jury during its penalty phase deliberations.
On appeal, defendant further contends the State introduced victim impact evidence concerning the murder of Terrance Blaze without providing notice to the defendant. Specifically, she complains about references Blaze’s girl friend made describing him as “smart,” “shy,” and “gentle,” and additional comments concerning his relationship with her three-year-old child. Trial Tr., vol. XXIX, pp. 5966-67 (Feb. 15, 2006). Defendant contends this description was misleading because other evidence demonstrated that Blaze was actually “a member of a notorious local gang.” Brief for the Appellant, p. 71.
|7fiOur review of the record shows defense counsel did not lodge any objection to these brief descriptions of Blaze’s character and it has not been preserved for appellate review. La.Code Crim. Proc. art. 841; Wessinger. Nevertheless, considering it was Blaze’s girl friend who made these statements, the jury surely would not have been surprised by these favorable characterizations of Blaze. See generally State v. Manning, 03-1982 (La.10/19/04), 885 So.2d 1044,1099 (holding that “[a]ssuming that testimony indicating victim’s family had no sympathy for defendant should not have been admitted, the error was harmless as such evidence ‘certainly would come as no surprise to a member of the jury’ ”). As a result, this argument lacks merit. Moreover, these characterizations certainly did not interject an arbitrary factor into the jury’s .deliberations at sentencing.
Finally, the defendant complains about a portion of the State’s cross-examination of Dr. Vigan concerning post-traumatic stress disorder (PTSD). On redirect, the witness had testified that defendant had first been *92 diagnosed with PTSD at twelve years of age and still suffered from the condition. In response, the State hypothetically asked whether the defendant may have caused her nine-year old nephew to suffer from the PTSD when she brought him to the Brandon crime scene, where the victim’s body still remained, following her commission of the offense.
Again, counsel lodged no objection to the State’s inquiry and it has not been preserved for appellate review. La. Code Crim. Proc. art. 841. In any event, even though the hypothetical question may not have qualified as victim impact evidence under art. 905.2 and Bernard, it was arguably relevant. As the State noted, the hypothetical question addressed the defendant’s character and propensities because it demonstrated defendant’s “callous behavior and reckless exposure of a young child to the horrors at the Brandon home.” Brief for the Respondent, p. 47.
| .^Defendant’s claims concerning the introduction of victim impact evidence lack merit.
CONSTITUTIONALITY OF LA. CODE CRIM. PROC. art. 905.5.1
(Assignment of error 31)
The defendant claims the trial court erred when it denied her pretrial motion to declare Article 905.5.1 unconstitutional and for relief from the unconstitutional discovery requirements in article 905.5.1. The defendant’s motion contended, inter alia, that the inclusion of section E in article 905.5.1violated the defendant’s constitutional rights. Specifically, the defendant contends the inclusion of section E causes her to relinquish her Fifth Amendment rights against self-incrimination because to demonstrate that she is mentally retarded, and hence exempt from execution, she must provide the State with discovery and submit to a mental examination by a state expert.
We addressed this argument in State v. Turner, 05-2425 (La.7/10/06), 936 So.2d 89, 103. In Turner, we reversed a district court ruling which had found article 905.5.1unconstitutional. Specifically addressing the discovery provisions, we stated:
When a capital defendant claims to be mentally retarded, he, too, cannot offer from the past or present that which is favorable to his contention while simultaneously withholding information which is unfavorable to his claim. In making a determination of whether information or records are necessary to a determination pursuant to La.Code Crim. Proc. art. 905.5.1E, the trial court should keep in mind the relevancy of the information or records sought and La.Code Evid. art. 403. (Relevant evidence may be excluded if its probative value is outweighed by its prejudicial impact, confusion of issues or misleading to the jury).
Paragraph E only mandates the disclosure of materials “relevant or necessary to an examination or determination” of the defendant’s mental retardation. A fair reading of the article generally suggests it does not require a defendant to disclose any information subject to the attorney-client privilege or that may be admitted at trial on the issue of guilt. The trial court’s finding that paragraph E could possibly cause a conflict with the defendant’s Fifth Amendment rights is wholly speculative.
Turner, 936 So.2d at 103.
As an initial matter, we observe that by the time the defense filed the motion objecting to the discovery provisions of the code article, it had already filed the motion to quash the indictment *93 based on the allegation that defendant was exempt from the death penalty because she was functionally retarded, and filed its discovery responses which included much of the documentation relating to her prior mental examinations. Accordingly, we find the defense waived any issue concerning the allegedly overly expansive discovery provisions of the statute by turning over the material unconditionally before filing the motion challenging the constitutional validity of the code article.
Moreover, we find the State was entitled to the materials under the more general discovery provision of La.Code Crim. Proc. art. 724 which provides for the production of documents and tangible objects that are in the defendant’s possession and that the defendant intends to use in evidence at trial. In this ease, because Dr. Vigan testified at the penalty phase that he relied upon the medical records of defendant when making his evaluation, the State then became entitled to examine the records to impeach his testimony. See State v. Williams, 445 So.2d 1171, 1181 (La.1984) (citing State v. Monroe, 205 La. 285, 17 So.2d 331 (1944)) (the State “does not and cannot know what evidence the defense will use until it is presented at trial,” it is for this reason that the prosecution has been given the right of rebuttal).
Lastly, the defendant fails to show her submission of any allegedly nondiscov-erable records under the code articles prejudiced her. Cfi Bourque, 622 So.2d at 239 (before being entitled to relief, defendant must show prejudice resulting from the state’s failure to comply with discovery procedure). Accordingly, defendant’s assignment of error lacks merit.
| ^DEFENDANT'S PRO SE MOTIONS
(Assignments of error 6-9)
In these assignments, the defendant claims the trial court erred when it did not entertain her pro se motion for a change of venue and when it denied her motion for appointment of new counsel.
The defendant’s pro se handwritten motion for change of venue reads in pertinent part:
I’m not trying to tactic a delay, But only a fair trial. I feel a fair & impartial trial “will not ” be obtained in this parish, due to the local parish where the prosecution is pending, and that they will affect answers of the jurors on the voir dire examination or the testimony of any witnesses at trial. By me crime being such a high profile case, by reason of prejudice existing in the public minds, where the nature of my case was notorious for months. And the community is outraged by it, influenced blisted [sic] in both TV & newspapers where such as here at the jail CCC been “placed on display ” for the tours of the jail, where deputy’s [sic] tell tours who I am, what I’m here for, what they think might happen to me & etc like on 09-02-03. Bye all these things that it will make an impossible fair trial. I feel as these factors will cumulative and affect and deprive me of a fair and impartial trial. And that my rights are totally being ignorant in this case.
Trial Tr., vol. Ill, p. 667 (Oct. 9, 2003).
In the motion for appointment of new counsel, defendant’s pleading provides:
I want some new other than David R. McClatchey because his not willing to help me, he does not want me to take my case to trial. And he tricked me into believing something different and is for-cusing [sic] to accept a plead [sic], that I refuse to accept anything but my trial only. He told me his trying to save my life I’ll be better off with life anyways.
Trial Tr., vol. Ill, p. 669 (Oct. 9, 2003).
The trial court did not specifically address the motion for a change of venue, *94 but ruled as follows on the defendant’s motion for substitution of counsel:
All right. Mr. McClatchey, I realize that this pro se Motion has put you in a difficult position, because her pro se Motion is she wants new [c]ounsel.
All right. My position is that, if somebody has [e]ounsel, I am not going to consider their pro se [m]otions. You cannot have it both ways.
|snYou have got a[l]awyer. Mr McClatchey has been appointed by the Court to represent you. He is probably one of the most experienced capital [a]t-torneys in the whole part of the [s]tate, and this [m]otion to appoint new [counsel is absolutely ludicrous. I am denying it.
I am just telling you right now, Ms. Holmes, that I am not going to consider any pro se Motions. You have an [a]t-torney. Your [attorney is going to be filing Motions for you in court.
Trial Tr. Supp. Yol., pp. 2-3.
It is well established that motions pending at the commencement of trial are waived when the defendant proceeds to trial without raising as an issue the fact that the motions were not ruled upon. State v. Williams, 97-1135 (La.App. 5 Cir. 5/27/98), 714 So.2d 258, 264; State v. Scamardo, 97-0197 (La.App. 5 Cir. 02/11/98), 708 So.2d 1126, 1129, writ denied, 98-0672 (La.7/2/98), 724 So.2d 204; State v. Price, 96-0680 (La.App. 5 Cir. 2/25/97), 690 So.2d 191, 196. Thus, by not adopting the defendant’s motion for a change of venue, defense counsel waived it. Furthermore, given the totality of the prospective jurors’ responses during voir dire, the defendant has not shown that a motion for a change of venue would have had any merit and thus no prejudice occurred when the trial court failed to rule on the motion. See La.Code Crim. Proc. art. 921 (“A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused.”).
Moreover, a trial court need not even entertain pro se motions when a defendant is represented by counsel and entertaining the motions will lead to confusion at trial. See, e.g., State v. Outley, 629 So.2d 1243, 1250 (La.App. 2 Cir.1993), writ denied, 94-0410 (La.5/20/94), 637 So.2d 476 (“It is well-settled in Louisiana that a trial court is not required to entertain motions filed by a defendant who is represented by counsel.”)(citing State v. McCabe, 420 So.2d 955, 958 (La.1982)(“While an indigent defendant has a right to counsel as well as the opposite |S1 right to represent himself, he has no constitutional right to be both represented and representative.”)). Accordingly, the defendant’s assignments of error are meritless.

CAPITAL SENTENCE REVIEW

Under La.Code Crim. Proc. art. 905.9 and La. S.Ct. Rule 28, we review every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury’s findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has filed the Uniform Capital Sentence Report (“UCSR”) required by La. S.Ct. Rule 28 § 3(a) and the Department of Public Safety and Corrections submitted a Capital Sentence Investigation Report (“CSIR”). See La. S.Ct. Rule 28 § 3(b). In addition, the State and *95 the defense have filed sentence review memoranda.
Those documents and Brenda Bruce’s penalty phase testimony show defendant, Brandy Aileen Holmes, is a Caucasian female, born on July 25, 1979, to the legal union of Johnny Holmes and Brenda Bruce in Tylertown, Mississippi. Defendant’s parents separated and defendant moved with her mother to Shreveport when she was two years of age. Defendant’s father testified at the guilt phase concerning the theft of the murder weapon from his residence in Mississippi. Brenda Bruce testified at the penalty phase about defendant’s difficult birth and her consumption of alcohol during her pregnancy. Defendant has an older sister and a younger brother, both of | S2whom appear to be half-siblings.[31] Although the defendant claims to have one child, no evidence presented supports that allegation.
According to the defendant’s mother, the defendant began school in special education, and she only completed the sixth grade. Mrs. Bruce further claimed that defendant was raped at 12 years of age and was committed to a mental hospital for six months. Defendant has an extremely lengthy juvenile and adult criminal history.[32] In fact, since the age of 14 or 15, it appears the defendant was continuously incarcerated except for a period of approximately seven months preceding the present offense. Defendant has no history of gainful employment.

PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS

The first-degree murder of Julian Brandon, Jr., occurred on January 1, 2003, and following jury selection, trial commenced in February of 2006, over three years after the crime was committed. The victim, a Caucasian male, was 70 years of age at the time of his death. Alice Brandon, who survived being shot in the head by defendant or Coleman, is also Caucasian, and was 68 years of age at the time of the lasoffense. Defendant, a Caucasian female, was 28 years old at the time of this offense. Race was not an issue at trial.
No pretrial publicity tainted the jury pool. Although defendant filed a pro se motion for a change of venue shortly after her indictment, it was not pursued by counsel.
Defendant raised various instances in which she claimed arbitrary factors were interjected into her capital trial. However, all of these allegations were addressed in the text of this opinion and found without merit.

AGGRAVATING CIRCUMSTANCES

The State relied on three aggravating circumstances under La.Code Crim. *96 Proc. art. 905.4(A) and the jury returned the verdict of death, finding all three were supported by the evidence: (1) the offender was engaged in the perpetration or attempted perpetration of an armed robbery; (2) the victim was older than 65 years of age; and (3) the offender knowingly created a risk of death or great bodily harm to more than one person La. Code Crim. Proc. art. 905.4(A)(1), (4), and (10). The State’s evidence presented in the guilt phase, and reintroduced at the penalty phase, established that, either personally or acting as a principal, defendant shot both Julian and Alice Brandon, and stabbed Julian Brandon. The shootings and stabbing occurred during the defendant’s armed home entry into the Bran-dons’ residence in which she took jewelry and credit cards from the house, where the lawful occupants of the residence had lived beyond their 65th birthdays. The three aggravating circumstances relied upon by the State were fully supported by the evidence. Consequently, the defendant’s sentence of death is firmly grounded.
| m.PROPORTIONALITY
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Bur-rell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Wille, 559 So.2d 1321, 1341 (La.1990); State v. Thompson, 516 So.2d 349, 357 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). This Court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently “large number of persuasive mitigating factors.” State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).
We review death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury’s recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7.
The State’s Sentence Review Memorandum reveals that since 1976, jurors in the First Judicial District Court have returned a guilty verdict in 41 capital cases, including defendant’s case, and of those, juries have recommended the imposition of the death penalty 15 times.[33]
*97 | suit is appropriate for this Court to look beyond the 1st JDC and conduct the proportionality review on a statewide basis. Cf. State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1030-31, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). This Court has observed that Louisiana juries appear especially prone to impose capital punishment for crimes committed in the home. See State v. Leger, 05-0011 (La.7/10/06), 936 So.2d 108, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007); State v. Blank, 04-0204 (La.4/11/07), 955 So.2d 90, cert. denied, — U.S. —, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007); State v. Bridgewater, 00-1529 (La.1/15/02), 823 So.2d 877, cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003)[34]; State v. Jacobs, 99-1659 (La.6/29/01), 789 |86So.2d 1280;[35] State v. Howard, 98-0064 (La.4/23/99), 751 So.2d 783, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999); State v. Gradley, 97-0641 (La.5/19/98), 745 So.2d 1160; State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998); State v. Tart, 92-0772 (La.2/9/96), 672 So.2d 116 (La.1996), cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Code, 627 So.2d 1373 (La.1993); State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Perry, 502 So.2d 543 (La.1986), cert. denied, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987); State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Glass, 455 So.2d 659 (La.1984), cert. denied, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985); State v. Summit, 454 So.2d 1100 (La.1984), cert. denied, 470 U.S. 1038, 105 S.Ct. 1411, 84 L.Ed.2d 800 (1985); State v. Williams, 490 So.2d 255 (La.1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780(1987). Wingo observed in this regard that “[t]he murder of a person by an intruder violating the sanctuary of the victim’s own home [is] a particularly terrifying sort of crime to decent, law abiding people.” Id., 457 So.2d at 1170.
Moreover, Louisiana juries have not hesitated in imposing the death penalty in a variety of cases involving multiple deaths *98 or when a defendant creates the risk of death or great harm to more than one person. See State v. Scott, 04-1312 (La.1/19/06), 921 So.2d 904, cert. denied, 549 U.S. 858, 127 S.Ct. 137, 166 L.Ed.2d 100 (2006) (two female bank tellers shot during bank robbery; first-degree murder convictions affirmed, case remanded for hearing under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)); State v. Brown, 03-0897 (La.4/12/05), 907 So.2d 1 (couple kidnaped from their home, both shot and then found burned in their torched vehicle); State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999) (ex-employee returned to restaurant, shot three employees and killed two); State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998) (mixed-race couple stabbed to death in their home during an aggravated burglary); State v. Baldwin, 96-1660 (La.12/12/97), 705 So.2d 1076, cert. denied, 525 U.S. 831, 119 S.Ct. 84, 142 L.Ed.2d 66 (1998) (defendant shot and killed his estranged wife and the three men who were with her at the time); State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996) (defendant murdered his estranged girl friend and severely wounded her mother); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996) (ex-employee returned to restaurant, killed one employee and attempted to kill another); State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996) (husband killed estranged wife and new boyfriend); State v. Deboue, 552 So.2d 355 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990) (murder of two children in an apartment defendants intended to burglarize).
Finally, with respect to La.Code Crim. Proc. art. 905.4(A)(10) and La.Rev.Stat. § 14:30(A)(5) (victim over the age of 65), juries in Louisiana have readily returned the death sentence when the elderly are preyed upon as victims. See Draughn, supra; Bridgewater, supra; Jacobs, supra; State v. Bowie, 00-3344 (La.4/3/02), 813 So.2d 377, cert. denied, 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002); Howard, supra; Gradley; supra; State v. Taylor, 99-1311 (La.1/17/01), 781 So.2d 1205, cert. denied, 534 U.S. 844, 122 S.Ct. 106, 151 L.Ed.2d 64 (2001).
Compared to these cases, it cannot be said the death sentence in this case is disproportionate.
DECREE
For the reasons assigned herein, the defendant’s conviction and death sentence are affirmed. This judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for cer-tiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial court shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La.Rev.Stat. § 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any State post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. *99 § 15:149.1; and (2) to litigate expeditiously the claims raised in that application, if filed in the state courts.
AFFIRMED.
CALOGERO, Chief Justice, dissents and assigns reasons.
JOHNSON, Justice, dissents and assigns reasons.

. The grand jury also charged the defendant with the attempted first-degree murder of his wife, Alice Brandon. The court minutes of February 11, 2006, show the State dismissed Count 2 of the indictment which charged the defendant with the attempted first-degree murder of Alice Brandon.

. From the outset, we note defense counsel conceded the defendant was guilty of second-degree murder. After considering the evidence outlined infra, the jury found the State proved otherwise.

. On February 17, 2005, a jury unanimously returned a verdict of guilty against Robert Coleman, finding he committed the first-degree murder of Reverend Brandon. The jury also returned a death verdict against him, finding all four aggravating circumstances the State urged. Nevertheless, on November 2, 2007, a majority of this Court reversed Coleman's conviction and sentence, finding the State's proffered reason for the exercise of its peremptory challenge against an African-American prospective juror was not facially neutral and thus violated the equal protection clause. State v. Coleman, 06-0518 (La.11/2/07), 970 So.2d 511. Accordingly, we reversed Coleman’s conviction and sentence, and remanded the case to the trial court for a new trial. Id. at 517.

. At trial, Demetrius Clemens, the defendant’s nephew who was nine years of age, identified a videotaped interview in which he discussed entering the Brandon residence with defendant. The videotape itself, exh. 120, is not included in the record provided to us, but is on file at the Caddo Parish Clerk of Court’s office.

. The investigation showed a close link between the defendant and Coleman. On Christmas Eve 2002, the defendant and Coleman traveled from defendant's father's home *51 in Mississippi to Shreveport. The defendant’s mother picked them up and brought them to her trailer while the couple was in Shreveport.

. Dr. Williams testified that the cause of Fetal *52 Alcohol Syndrome is the toxic effects of alcohol on the fetus. He further stated that fetal alcohol syndrome is a cluster of symptoms characterized by four criteria. The following criteria must be fully met for an FAS diagnosis: (1) growth deficiency — prenatal or postnatal height or weight (or both); (2) three FAS facial features (shortened palpebral fissures — that means tire inner portion of the eye is shorter than normal by two standard deviations; a flattened philtrum — that means a flattening of the portion between the upper lip and the bottom of the nose; and thinness of the upper lip); (3) central nervous system damage; and (4) prenatal alcohol exposure.

. Although this testimony was not presented to the jury, Dr. Vigan testified at the pre-trial hearing on the defendant's motion to quash that the defendant's full scale IQ was 77, a score that was in the borderline range of measured intelligence.

. The defendant has juvenile delinquency adjudications for the following offenses: carrying a concealed weapon; attempted simple escape; damage to property; possession of stolen property; theft; and unauthorized entry of an inhabited dwelling.
As an adult, defendant has felony convictions for attempted aggravated escape and aggravated battery. In addition, she has the following misdemeanor convictions: seven counts of simple criminal damage to property; four counts of simple battery; and two counts of battery of a police officer.
At 15 years of age, the defendant was sentenced to juvenile prison until the age of 21 for unauthorized entry of a dwelling. While she was in juvenile prison at the Jetson Correctional Center for Youth, she was charged with multiple counts of battery. Ultimately she was sentenced as an adult to two years at the Louisiana Correctional Institute for Women.

. The State introduced a redacted version of this letter at the penalty phase. Admission of this evidence is the subject of a separate assignment of error discussed infra.

. When the defendant renewed her motion to quash and admitted the color photographs of her brain, she also attached the report of the MRI and PET Scan findings. Dr. James C. Patterson, II, an expert in neuroimaging, found abnormalities in multiple regions of the brain when he subjected the MRI result to objective statistical evaluation. Although he testified that some of these abnormalities were consistent with published results on FAS, the defendant did not have other expected brain abnormalities, i.e., defects in the corpus callosum; changes in the ventral frontal cortex; changes of the hippocampus; decreased brain metabolism. In summation, Dr. Patterson testified the only brain abnormality found in the MRI was a dysmorphic, or funny-shaped, central nucleus of the amygda-la; he could not relate any PET scan abnormalities to published results on FAS.

. Defendant points specifically to two portions of Dr. Vigan’s testimony relevant to the Bennett criteria. See pp. 53-54, supra. First, she maintains her limited attention span would have rendered her incapable of assisting counsel as demonstrated by Dr. Vigan’s testimony that:
... Miss Holmes is sort of a story teller. She'll tell stories that will quickfly] bring attention. She's easily distracted in terms of being able to stay on point and move from point A to point B to point C. She will meander. Her listening and comprehension of ideas is poor so it's difficult, I think it’s difficult for her to understand the abstractions of things.
So for example, if you tell her, if you put your hand into a fire, you're going to get burned, she’d understand that. But if you tell her that A is going to stand for a certain numerical value and B is going to stand for another numerical value and you’re going to manipulate those values, she’s not going to understand that. Or if A is equal to B and B is equal to C, she’s not going to be quick to understand that A equals C. So in terms of abstraction and connecting ideas, which this courtroom demands, she’s going to have a greater limitation.
The analogy that I used previously I think actually in front of Judge Crichton, the courtroom — some people come into the courtroom with one megabyte of RAM. And when they’re in my office I can teach them and get answers and work with them. But then when you come into this courtroom, you need 100 megabytes of RAM. She has to be able to sit and listen to my answer. She has to listen to your question. She may have to sit and listen to [the counsel for the State] and consider what he's saying. She has to listen to what the judge is saying. She has to listen to witnesses. We’re talking about things that she may know something about, then be able to help both of you and inform you. All of that is a complex process.
Trial Tr„ vol. XIX, pp. 4200-01 (Nov. 10, 2005).
Defendant also points to Dr. Vigan’s testimony suggesting she may make an unsuitable witness:
She is impulsive. She is emotionally reactive. She doesn’t speak well. She doesn’t understand a lot of times the import of questions, as many of us have that, but she has certainly a deficit of that. She doesn’t present as someone who takes this seriously. She, in my interview with her, she didn’t like me because I was talking with her about how absolutely serious this is.
I wasn’t trying to tell her that I was in favor of a jury giving her the death penalty, but I was trying to talk with her about how serious the death penalty is and how serious this whole process is. She misper-ceived all of that, telling my assistants and Dr. Williams that she didn’t want to see me again because I was for her getting the death penalty or something like that.
*58 So, it's just in my ability to really get her to tell the truth, be accurate with the truth, as many facts as possible; I had trouble getting that from her. You would have trouble getting that from her probably as well. It was all misperceived in my hour and a half interaction with her.
Trial Tr„ vol. XIX, pp. 4201-02 (Nov. 10, 2005).

. See, e.g., one letter, the defendant penned to a friend. It reads:
Hey Chaz,
I know you thought I forgot about you. No Never that Honey. I’m Back locked up if you didn't see it on the news or in the newspaper. Girl, yes. They got me charged with 1st degree murder armed robbery attempted 1st degree murder and 2nd degree murder. I sit there and watched my Baby’s Daddy kill these white folks and yes I took the Visa card the gold Mastercard and the codes and cleaned there Bank accounts out. They was going to Book my 15 year old Brother, But I went ahead and took all charges & I have Affidavit to get notarized so I can let my Baby's daddy go to[o]. You know damn well I'm going to try my Best to escape and you know this too. I got it mostly planned. Don't be mad, Chaz. I gotta have my Money ya know. I goes back to court Feb. 18th 03 Girl don’t worry yourself about me. I’ll be okay, I guess you know. You be cool and write me back and tell me the low down/ who all is Back up in there okay. Here's my address okay....
Love Always,
Ms. Brandy
Trial Tr„ vol. X, pp. 2105-06 (Jan. 17, 2003).

. Although defendant was 23 years of age when she committed the crime, she suggests she had the emotional and mental development of a child. Thus, she contends the holding of Roper should be applicable to her.

. The substance of the testimony of Dr. Williams and Dr. Vigan is detailed at various places throughout this opinion.

. Despite the fact the issue of mental retardation, as required by statutory law, was properly reserved for the jury and not the trial court, the defendant neither requested that the juiy definitively decide the issue as authorized by La.Code Crim. Proc. art. 905.5.1(B) nor sought a jury instruction charging jurors that it could not return a death verdict if it determined defendant was mentally retarded. Ultimately, because the defendant did not file the required notice and argue the issue of mental retardation to the juiy as required by La.Code Crim. Proc. art. 905.5.1, the issue was not preserved for appellate review. At this point in these trial proceedings, it is not within our province to second-guess the wisdom of this course of action or delve into the trial strategy that well-seasoned and experienced capital defense counsel chose to employ. See State v. Myles, 389 So.2d 12, 31 (La.1980) (recognizing that this Court “does not sit to second-guess strategic and tactical choices made by trial counsel.'') Notwithstanding, we observe the defendant presented evidence from three experts at the penalty phase alleging she suffered from fetal alcohol syndrome and argued that as a mitigating factor during sentencing.

. In Anthony, all three perpetrators to the restaurant robbery/murder brought handguns and fashioned a crude silencer using potatoes which they placed on each gun’s barrel. Id., 776 So.2d at 380-81. The planning exhibited in bringing such a device to the robbery of the restaurant strongly suggested each gunmen anticipated using his weapon. Even though Anthony claimed he was not the shooter, one of the surviving victims testified the last person he saw before the shots rang out in the walk-in cooler was defendant; the survivor stated defendant was holding a gun with a potato on the end of the barrel. Moreover, circumstantial evidence demonstrated that of the three perpetrators, defendant’s shoes were the most heavily encrusted with potato particles. Accordingly, we ruled that “even without establishing that [Philip Anthony] was the triggerman, his conviction is valid because he was involved in a felony-murder and he intended, from the outset, to kill these victims.” Id. at 386.

. La. Sup.Ct. Rule 28 provides in pertinent part:
Section 1. Review Guidelines. Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a)whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

. As discussed infra, while Ward attempted to locate Wright, Captain Bobby Abraham confronted defendant about her allegation that Wright committed the murder. At this point, the defendant responded with a second story about the murders, claiming that she committed the violent entry into the Brandon home with her boyfriend, Robert Coleman, and that she shot both Reverend and Mrs. Brandon.

. He further testified that he first encountered the defendant when he asked to take a photo of the soles of her shoes during the interrogation to determine whether they matched footprints found at the Brandons' residence.

. Lieutenant Duncan corroborated Abraham’s testimony concerning the circumstances of this statement. Trial Tr., vol. XIX, p.4130 (July 21, 2005).

. McNaughten’s Case, 1 Car. & K. 130 (1843).

. In pertinent part, Art. 703(G) provides:
When a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state shall be required, prior to presenting the confession or statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
A ruling made adversely to the defendant prior to trial upon a motion to suppress a confession or statement does not prevent the defendant from introducing evidence during the trial concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.

. In Assignment of Error no. 25, the defendant also complained about the admission of evidence during the guilt phase of the murder of Terrance Blaze, as well as defendant's participation in gang activity. Because the defendant did not lodge a contemporaneous *81 objection to that evidence, we treat that assignment of error in the appendix to this opinion and find that issue not properly before us.

. Ashley also testified about defendant's involvement in the attempted burglary of a neighbor, Lori Hendricks Griffin. Ultimately, the State did not introduce any evidence of this incident at the penalty phase.

. La.Code Crim. Proc. art. 720 provides in pertinent part:
Upon motion of defendant, the court shall order the district attorney to inform the defendant of the state’s intent to offer evidence of the commission of any other crime admissible under the authority of [La.Code Evid. art.] 404.

. La.Rev.Stat. § 14:60 defines aggravated burglary in part as "the unauthorized entering of any inhabited dwelling ... with the intent to commit a felony therein, if the offender is armed with a dangerous weapon.” One is guilty of an attempt when she has the specific intent to commit the offense and does or omits an act for the purpose of and tending directly toward accomplishing her object, La.Rev.Stat. § 14:27.

. Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. Code Evid. art. 801(C).

. The references to plea negotiations were redacted from the letter. Accordingly, as admitted the letter read:
Mr. Ed Blewer, III, Good Evening Sir!.... Yes I did shot & kill Terrance Blaze, But only Because I was threatting and Beatting up to do so.... Thank you and have a nice day.
Exh. P-32, vol. XXX, p. 6010 (February 15, 2006).

.La.Code Evid. art. 410 reads in pertinent part:
A. General rule. Except as otherwise provided in this Article, evidence of the follow *88 ing is not, in any civil or criminal proceeding, admissible against the party who made the plea or was a participant in the plea discussions:
* * *
(4) Any statement made in the course of plea discussions with an attorney for or other representative of the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn or set aside.

. The trial court stated:
And I will state for the record that I was presiding judge in State of Louisiana versus Robert Coleman. And I did ask the lawyers to work together to redact and shorten the video of Mrs. Brandon because I wanted to make certain that it was not something that would unduly inflame the jury, that it was not so prejudicial that it would inflame them unnecessarily. And I wanted to make sure that it would comply with all the jurisprudence. Therefore, the lawyers worked in that case to redact the video such that I think it is clearly admissible.
Trial Tr., vol. XXVIII, pp. 5853-54 (Feb. 14, 2006).

. In her penalty phase testimony, Brenda Bruce stated she has four living children, all from different fathers. However, the UCSR only refers to two siblings of defendant.

. The UCSR reveals that defendant has juvenile delinquency adjudications for the following offenses: carrying a concealed weapon; attempted simple escape; damage to property; possession of stolen property; theft; and unauthorized entry of an inhabited dwelling. As a juvenile, defendant was also arrested for damage to property and possession and concealing stolen property although these charges were dismissed.
As an adult, defendant has felony convictions for attempted aggravated escape and aggravated battery. In addition, she has the following misdemeanor convictions: seven counts of simple criminal damage to property; four counts of simple battery; and two counts of battery of a police officer.
The district attorney dismissed the attempted first-degree murder charge relating to the shooting of Mrs. Brandon. The second-degree murder count relating to the homicide of Terrance Blaze is apparently still pending in Caddo Parish.

. State v. Holmes (the present case); State v. Coleman, 06-0518 (La.11/02/07), 970 So.2d 511 (co-defendant in the present case; conviction and sentence reversed on appeal based on racial discrimination in the State's exercise of peremptory challenges); State v. Campbell, 06-0286 (La. 5/21/08) 983 So.2d 810; State v. Draughn, 05-1825 (La.1/17/07), 950 So.2d 583; State v. Wilson, 03-1229 (La.3/30/05), 899 So.2d 551 (death sentence vacated in light of Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), because Wilson was a minor at the time of the offenses; resentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence); State v. Williams, 01-1650 (La.11/01/02), 831 So.2d 835 (following a hearing pursuant to Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), Williams was deemed retarded and resentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence); State v. Irish, 00-2086 (La.1/15/02), 807 So.2d 208, cert. denied, 537 U.S. 846, 123 S.Ct. 185, 154 L.Ed.2d 73 (2002); State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254; State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, *97 cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999); State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct 504, 145 L.Ed.2d 390 (1999); State v. Cooks, 97-0999 (La.9/9/98), 720 So.2d 637, cert. denied, 526 U.S. 1042, 119 S.Ct. 1342, 143 L.Ed.2d 505 (1999); State v. Tyler, 97-0338 (La.9/9/98), 723 So.2d 939, cert. denied, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999); State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); State v. Code, 627 So.2d 1373 (La.1993), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); State v. Felde, 422 So.2d 370 (La.1982), cert. denied, 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983).
Of the above-listed cases, Holmes, Coleman, Draughn, Edwards, Cooks, and Code all involved victims that were murdered in their own homes.

. Conviction for first-degree murder and death sentence set aside; jury’s verdict of guilty modified by this Court and judgment of guilty of second-degree murder entered; remanded to trial court for sentencing to life imprisonment under La.Rev.Stat. § 14:30.1(B). State v. Bridgewater, 00-1529 (La.1/15/02), 823 So.2d 877.

. Jacobs’s conviction and death sentence were reversed on appeal. State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280. During the pendency of his retrial, the United States Supreme Court rendered its decision in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)(Eighth Amendment precludes capital punishment for offenders under the age of 18 when they committed their crimes), making Jacobs, who was 16 years of age at the time of the offense, ineligible to face capital sentencing on retrial.